[No. 39147-3-II.   Division Two.   November 16, 2010.]

THE STATE OF WASHINGTON, *Respondent*, v. EDWIN DAVID CORBETT, *Appellant*.

*Lise Ellner*, for appellant.

*Mark E. Lindquist, Prosecuting Attorney*, and *Thomas C. Roberts, Deputy*, for appellant.

¶1 QUINN-BRINTNALL, J. — A jury found Edwin Corbett guilty of four counts of first degree child rape. Corbett appeals, asserting that (1) the trial court improperly limited his cross-examination of a witness; (2) sufficient evidence does not support three of his convictions; (3) the jury instructions failed to protect his rights to be free from double jeopardy and to receive unanimous jury verdicts; (4) the prosecutor committed misconduct during closing arguments; and (5) the sentencing court imposed an unlawful prohibition on his contact with all minors, including his own biological children. We affirm because (1) Corbett did not provide sufficient argument related to any allegedly erroneous limitations on his cross-examination of a witness; (2) sufficient evidence supports all his convictions; (3) the jury instructions were proper and did not prejudice Corbett's trial; (4) the prosecutor did not commit misconduct; and (5) the sentencing condition prohibiting contact with all minor children, including Corbett's own biological children, is a valid crime-related prohibition that does not unduly burden his fundamental parenting rights.

## FACTS

¶2 In January 2005, Kyla O. and Corbett moved into a North Tacoma, Washington, home along with Kyla O.'s two

children from a previous marriage. Kyla O. shared custody with her ex-husband of her then six-and-a-half-year-old daughter, J.O., and her then three-and-a-half-year-old son, D.O. Kyla O. and Corbett married in March 2005. On July 31, 2005, Corbett learned that Kyla O. planned to leave him, a struggle ensued, and Corbett assaulted Kyla O.[1] Shortly thereafter, Kyla O. permanently moved out of the house and ended her relationship with Corbett, though they are still married. Kyla O. and her children have had no contact with Corbett since 2005 other than during court proceedings.

¶3 When they lived together, Kyla O. worked and provided for the family while Corbett took care of the children. Kyla O.'s night work schedule and J.O.'s school schedule were such that on most days the two spent minimal time together. Accordingly, Corbett served as the primary caregiver for Kyla O.'s children when they were not with their father, including playing with them, disciplining them, and putting them to bed. Kyla O. knew that Corbett gave the children karate lessons and sometimes played a game called "open your mouth and close your eyes" involving candy suckers. 3 Report of Proceedings (RP) at 281.

¶4 At trial, Kyla O. testified that in late October 2005, J.O. spontaneously told her that Corbett's Tae Kwon Do lessons used to involve

"sit[ting] on the floor and clos[ing] our eyes and open[ing] our mouth[s]. It was supposed to be like for relaxation, but he would stick his penis[2] in my mouth, and I know that because even though he told me to close my eyes all the way, I would keep them cracked open, and I saw what he was doing."

---

[1] At a separate trial, Corbett pleaded guilty to misdemeanor assault for this incident.

[2] Kyla O. later testified that J.O. actually used the word "thing" but that Kyla O. immediately asked if "thing" meant Corbett's "penis" and J.O. clarified by saying, "Yes, his penis." 3 RP at 305.

3 RP at 304.[3] J.O. did not want to report the crime to the police.

¶5 Over the next year and a half, Kyla O. periodically asked J.O. questions such as, "[I]s there anything you need to talk about?" so that J.O. knew that she could come to Kyla O. when she (J.O.) was ready to talk about the abuse. 3 RP at 310. Eventually, J.O. told Kyla O. that Corbett had put his penis in her mouth several times and that, during one incident, he put whipped cream on it. J.O. also told Kyla O. that Corbett had threatened to harm her family if she told anyone about the abuse, but J.O. testified at trial that Corbett never threatened her.

¶6 Eventually, J.O. told several of her friends, including her best friend, C.F., about the abuse. Around September 2007, J.O. told C.F.'s father, Chad F., about the abuse. Chad F. conveyed the information to J.O.'s father, who in turn contacted the police and obtained counseling for J.O.

¶7 On November 26, 2007, the State charged Corbett with four separate counts of first degree child rape. An amended information specified that all four counts related to incidents that had occurred between January 1, 2005, and August 31, 2005.[4]

¶8 At trial, J.O. testified about several different instances where Corbett put his penis into her mouth during different games that required her to keep her eyes closed. Multiple witnesses testified about details of the abuse that J.O. had disclosed to them over the years.

¶9 J.O. testified that on two separate occasions, Corbett put a "soft thing" in her mouth as part of a "candy taste game"; the "candy taste game" consisted of closing her eyes, identifying two different candies by taste, and receiving the candies as a reward. 3 RP at 395, 400, 408. She also testified

---

[3] The trial court ruled in pretrial motions that J.O.'s statements to Kyla O.; her close friend, C.F.; C.F.'s father, Chad F.; and forensic child interviewer Cornelia Thomas were admissible under the child hearsay statute. RCW 9A.44.120.

[4] We note that there are four scrivener's errors in Corbett's judgment and sentence where the dates of his crimes are those included in the original information and not those in the amended information.

that the "soft thing" Corbett placed in her mouth both times felt like the same object, felt "like regular skin," "didn't really have any flavor," did not have a fingernail, and that she had trouble keeping her mouth around it because "it was big and everything." 3 RP at 400-01. When she had to identify the "soft thing" as part of the candy game, J.O. testified that she did not "want to answer anything weird," so she lied and said it was a "sucker." 3 RP at 403. J.O. testified that after the games some of the candies that she received had "no sign of wetness" or were "completely dry." 3 RP at 404, 410. At trial, J.O. stated that she believed Corbett had put his "private area"[5] in her mouth because the soft thing was too big to be a finger, too small to be "his foot or anything like that," and because, when she sat on a toilet during the candy taste games, her head was at eye level with his private area. 3 RP at 406. J.O. also testified that both candy taste games where Corbett put the "soft thing" in her mouth were played in a bathroom.

¶10 J.O. also testified about karate lessons that Corbett gave her to teach her how to concentrate. During the karate lesson, J.O. put headphones on to listen to music, closed her eyes, and had to try to block out the music sounds to learn how to focus. Corbett would reward J.O. by placing frosting on his finger and then placing it in her mouth. J.O. testified that during one karate lesson, Corbett put the same "soft thing" that he had used during the candy game, with frosting on it, in her mouth. At trial, J.O. also stated that, during her final karate lesson which took place in a bedroom, Corbett taped cotton balls over her eyes, but that she could see under the cotton balls as Corbett put his penis into her mouth. J.O. testified that the way Corbett's penis felt in her mouth during the final karate lesson was the same way the "soft thing" felt in the other abuse instances that she had described.

¶11 After the State rested, Corbett moved to dismiss three of the four counts for lack of sufficient evidence.

---

[5] J.O. testified that a "private area" is "right between [the] legs" and used for "[g]oing to the bathroom." 3 RP at 406.

Specifically, Corbett argued that J.O. had not identified "with any certainty what was in her mouth on three of the four occasions which this case has been narrowed down to." 6 RP at 719. The trial court denied the motion.

¶12 Corbett then testified in his defense. Corbett admitted that he played candy games with the children "all the time," where he simply put candy in both children's mouths, without any guessing involved, to end their constant fights over particular pieces of candy. 6 RP at 775. He claimed that he had the children shut their eyes because D.O. worried about getting "cooties" from candy that had been in his sister's mouth. 6 RP at 775. Corbett denied giving the children any karate lessons because he felt they were not "mentally prepared" for karate, but he testified that he wrestled with them and showed them some moves. 6 RP at 777. Corbett denied that any sexual misconduct or touching occurred between J.O. and him.

¶13 The trial court instructed the jury, giving four identical "to convict" instructions.[6] The trial court also gave a unanimity instruction[7] and an instruction stating "A sepa-

---

[6] Jury instructions 10 through 13 read,

To convict [Corbett] of the crime of rape of a child in the first degree as charged in Count [I, II, III, IV], each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about the period between the 1st day of January, 2005 and the 31st day of August, 2005, [Corbett] had sexual intercourse with J.O.;

(2) That J.O. was less than twelve years old at the time of the sexual intercourse and was not married to [Corbett];

(3) That [Corbett] was at least twenty-four months older than J.O.; and

(4) That the acts occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence you have reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Clerk's Papers (CP) at 39-42.

[7] Jury instruction 6 reads,

In alleging that [Corbett] committed Rape of a Child in the First Degree, the State relies upon evidence regarding a single act constituting each count of the alleged crime. To convict [Corbett] on any count, you must unanimously agree that this specific act was proved.

CP at 35.

rate crime is charged in each count,"[8] both of which the State and Corbett proposed.[9] Clerk's Papers (CP) at 34.

¶14 On February 19, 2009, the jury returned guilty verdicts on all four counts. On April 17, the trial court imposed four concurrent sentences of 318 months to life confinement and placed Corbett under community custody for life. Corbett had an offender score of nine and no prior criminal history. Additionally, the sentencing court imposed 26 conditions on Corbett's community custody, including 2 that he challenges in this appeal. Condition 16 states, "Do not initiate or prolong physical contact with children under the age of 18 for any reason." CP at 115. Condition 25 states, "No contact with any minors without prior approval of the [Department of Corrections/Community Corrections Officer (DOC/CCO)] and Sexual Deviancy Treatment Provider." CP at 116. Corbett timely appeals.

## ANALYSIS

### LIMITING CROSS-EXAMINATION

■ ¶15 Corbett includes the following assignment of error in his brief: "Appellant was denied due process when the trial court erred by limiting defense cross-examination of a state's witness." Br. of Appellant at 1. But Corbett provides no argument or explanation of this assigned error anywhere in his brief. Without argument or authority to support it, we cannot address Corbett's assignment of error. RAP 10.3(a)(6) (appellate brief should contain argument supporting issues presented for review, citations to legal authority, and references to relevant parts of the record);

---

[8] Jury instruction 5 reads in its entirety, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." CP at 34.

[9] The State's proposed jury instructions are not in the record on review; but at trial, the trial court explicitly stated that Corbett's proposed instructions on unanimity and separate crimes, which are in the record on review and became jury instructions 5 and 6, were also included in the State's proposed instructions.

*State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004) (citing *Smith v. King*, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986)).

SUFFICIENCY OF EVIDENCE

¶16 Corbett next challenges the sufficiency of evidence supporting three of his four convictions. He bases his appeal on (1) J.O.'s inability to identify what he put in her mouth during the games/lessons when her eyes were closed and (2) alleged inconsistencies between J.O.'s trial testimony and her pretrial statements that were admitted at trial via other witnesses' testimonies, arguing that these inconsistencies created such a level of doubt that no rational jury could have returned a guilty verdict. Specifically, Corbett highlights inconsistencies regarding where the abuse allegedly occurred (bathroom, bedroom, or garage), the substances that he allegedly put on his penis (whipped cream, chocolate, icing, or frosting), and whether Corbett threatened harm if J.O. revealed the abuse. We hold that sufficient evidence supports all four of Corbett's convictions.

¶17 Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences that a trier of fact can draw from that evidence. *Salinas*, 119 Wn.2d at 201. Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990); *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533, *review denied*, 119 Wn.2d 1011 (1992).

¶18 In order to prove first degree child rape, the State had to show that (1) Corbett had sexual intercourse with J.O., (2) J.O. was less than 12 years old and not married to

Corbett, (3) Corbett was more than 24 months older than J.O., and (4) the acts occurred in Washington. RCW 9A.44.073. The definition of "sexual intercourse" includes any acts "involving the sex organs of one person and the mouth or anus of another whether such persons are of the same or opposite sex." RCW 9A.44.010(1)(c).

¶19 The evidence against Corbett is overwhelming. At trial, J.O. testified that, when she was 6 and 7 years old and lived with Corbett, who was around 30 years old at the time, (1) on three separate occasions while her eyes were closed, Corbett put a "soft thing" in her mouth that felt like skin, did not have a fingernail, and had no flavor; (2) on a fourth occasion she saw under cotton balls that were taped to her eyes that Corbett was putting his penis in her mouth; and (3) the feel of Corbett's penis in her mouth during the fourth incident matched the feel of the "soft thing" Corbett had put in her mouth on the other three occasions. Moreover, at least four other witnesses at trial testified that over the course of two years, J.O. made statements to them that included details similar to those that J.O. testified to at trial.

¶20 Corbett contends that J.O. could identify in only one instance exactly what he put in her mouth. But J.O. testified that the feel of Corbett's penis in her mouth in the last incident was the same feeling she had regarding the "soft thing" in her mouth in the other instances. Circumstantial evidence and direct evidence are equally reliable. *Delmarter*, 94 Wn.2d at 638. Based on J.O.'s trial testimony, any rational trier of fact could have found beyond a reasonable doubt that Corbett committed the essential elements of first degree child rape on four separate occasions.

¶21 Next, Corbett attempts to discredit J.O. by arguing inconsistencies in her pretrial and trial statements about some of the details of the abuse. Specifically, Corbett argues that J.O.'s pretrial and trial statements conflict as to (1) the location of the abuse, (2) the substances placed on Corbett's penis during the abuse, and (3) whether Corbett threatened her if she told anyone about the abuse.

■ ¶22 Corbett points to *State v. Alexander*, 64 Wn. App. 147, 822 P.2d 1250 (1992), to argue that J.O.'s inconsistencies are so extreme that a rational jury could not have found beyond a reasonable doubt that he sexually abused her. In *Alexander*, Division One of this court overturned multiple child rape convictions, in part because of extreme inconsistencies in the child victim's testimony at trial. 64 Wn. App. at 157-58. There, the child victim directly contradicted herself about whether a bathtub abuse incident ever occurred and whether her abuser used baby oil. *Alexander*, 64 Wn. App. at 150. Moreover, the victim's testimony as to the relative dates of her abuse contradicted her mother's testimony about times when the victim was around the alleged abuser. *Alexander*, 64 Wn. App. at 149-50.

¶23 In contrast, J.O.'s inconsistencies do not reach the level of those detailed in *Alexander*; Corbett's arguments are unpersuasive and fail for several reasons. As an initial matter, regardless of whether inconsistencies exist in J.O.'s statements, we defer to the trier of fact, here the jury, on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *Camarillo*, 115 Wn.2d at 71; *Walton*, 64 Wn. App. at 415-16. Corbett's entire argument regarding J.O.'s inconsistent statements goes to her credibility, and her credibility is a matter to be resolved by the jury that heard her testimony, not by a reviewing court. *Camarillo*, 115 Wn.2d at 71.

¶24 Moreover, our review of the record reveals that the inconsistencies in J.O.'s statements were not as significant as Corbett asserts. Although we acknowledge that J.O.'s pretrial and trial statements do directly contradict about whether Corbett threatened her, we do not agree with Corbett's claims of other inconsistencies in J.O.'s statements or that they are similar to the inconsistencies in *Alexander*.

¶25 Our review of the record in this case reveals no inconsistencies regarding the location of the abuse. At trial, J.O. testified that both candy games involving the "soft thing" took place in a bathroom and that the second karate

lesson abuse incident involving cotton balls and Corbett's penis took place in a bedroom. J.O. did not identify a location for the first karate lesson abuse incident; only after repeated questioning did J.O. testify that she thought the first karate lesson abuse incident occurred "somewhere downstairs" and that it "could have" happened in a bathroom. 4 RP at 466. Corbett claims that C.F.'s testimony that J.O. told her the karate abuse happened in a garage and a child abuse medical evaluator's testimony that J.O. said she was abused in a bedroom contradict J.O.'s trial testimony. But there is no inherent conflict between these testimonies. The garage location for karate abuse that J.O. told to C.F. does not conflict with J.O.'s trial testimony because that could have been the location of the first karate abuse incident and J.O. did not identify a specific location for this incident during the trial. The medical evaluator's testimony did not specify which incidents of abuse occurred in the bedroom or state that J.O. told her all the incidents occurred in a bedroom. J.O. testified at trial that at least some of the abuse, specifically the last karate lesson abuse incident, occurred in a bedroom. Thus, there are no direct inconsistencies between J.O.'s pretrial and trial statements about where the abuse occurred.

¶26 Inconsistencies on what specific substance (or substances) Corbett placed on his penis during the abuse were not extreme. Corbett went to great length at trial, and on appeal, to point out that, at trial, J.O. testified that he only ever put "frosting" or "icing" on his penis but that prior to the trial, she told people that he used "whipped cream" or "chocolate." Corbett overlooks a significant common thread between all these substances—all of them are sweet and sugary substances. That over a period of several years J.O. may have mentioned slightly different substances that were similar in nature is not an extreme inconsistency, especially when considering that J.O. was only six or seven

at the time of the abuse and that her eyes were closed during each incident except for the last one.[10]

¶27 Given the limited discrepancies in J.O.'s testimony, *Alexander* is distinguishable. Here, J.O.'s inconsistencies are (1) whether Corbett threatened her if she told anyone about the abuse and (2) which sweet substance Corbett sometimes put on his penis. This contrasts with *Alexander* where the victim provided testimony that contradicted other substantive evidence on whether the abuse occurred at all. 64 Wn. App. at 149-50. The relative temporal references that J.O. offered during the trial for when the abuse occurred were uncontradicted and she never recanted or suggested in any way that Corbett did not sexually abuse her at least four separate times. Accordingly, sufficient evidence supports each of Corbett's four convictions and we affirm them all.

JURY INSTRUCTIONS: DOUBLE JEOPARDY AND UNANIMITY

¶28 Next, Corbett argues that, by allowing the jury to convict him four times based on a single act, the jury instructions did not adequately protect his right to be free from double jeopardy. Specifically, Corbett argues that the trial court failed to instruct the jury that it must find separate and distinct acts supporting each count and enter unanimous verdicts based on these separate and distinct acts. Corbett requests that we vacate three of his convictions on this ground. But Corbett proposed the jury instructions he now seeks to challenge, and he has failed to preserve this issue for our review. Moreover, our review of the record does not support Corbett's claim that he was prejudiced by the trial court's instructions when taken as a whole.

---

[10] We note that Corbett himself sometimes confuses J.O.'s testimony about the various incidents when he alleges that J.O. contradicted herself. For example, in his brief, Corbett claims that J.O. initially testified that she could not remember if Corbett put anything on his penis and then changed her testimony, stating that he had put frosting on it. But J.O.'s testimony that she could not remember Corbett putting anything on his penis was in reference to the candy games, whereas her memory of frosting on the penis was in reference to a karate lesson. Accordingly, J.O.'s statements at trial did not conflict with one another.

¶29 Initially, we note that Corbett did not comply with CrR 6.15(c) and failed to timely object to the jury instructions he seeks to challenge for the first time on appeal. In fact, Corbett actually proposed the very jury instructions on which he relies for his double jeopardy argument. Accordingly, Corbett invited any error in addition to failing to comply with CrR 6.15(c). *State v. Phelps*, 113 Wn. App. 347, 353, 57 P.3d 624 (2002) ("The invited error doctrine applies . . . where the defendant engaged in some affirmative action by which he knowingly and voluntarily set up the error."); *see also State v. Henderson*, 114 Wn.2d 867, 870-71, 792 P.2d 514 (1990) (applying the invited error doctrine even when the alleged error is of constitutional magnitude).

¶30 In addition, when read together, the trial court's instructions accurately informed the jury about its duty. *State v. Jackman*, 156 Wn.2d 736, 743, 132 P.3d 136 (2006) (stating that challenged jury instructions are subject to de novo review and considered in the context of the jury instructions as a whole). The four separate "to-convict" instructions listed all the required elements of first degree child rape. The trial court instructed the jury that "[a] separate crime is charged in each count," that each count should be decided separately, and that verdicts for one count should not influence verdicts on the other counts. CP at 34. The trial court also instructed the jury that "the State relies upon evidence regarding a single act constituting *each* count" and that "[t]o convict [Corbett] on any count, [they] must unanimously agree that this specific act was proved." CP at 35 (emphasis added). Read together, the jury instructions accurately informed the jury that it must decide each count separately and that its verdicts must be unanimous.

¶31 Moreover, the entire trial focused on evidence and distinguishing characteristics of four separate and distinct instances of abuse. Each incident was given a separate descriptive identifying name that both counsel used in referring to the event. During closing arguments, the State

clearly connected the trial evidence of four separate incidents to the four separate "to-convict" instructions.[11] The jury instructions in the context of this case clearly conveyed to the jury that there were four counts related to four specific incidents of abuse that they were to consider.

¶32 Reading all the jury instructions and reviewing the evidence presented at trial along with the State's and Corbett's closing arguments, any reasonable jury would have known that it must find separate and distinct acts for each of the four guilty verdicts that it entered. Accordingly, Corbett has failed to show that the instructions he requested prejudiced him.

¶33 We recognize that a series of cases over the years has addressed a challenge similar to the one Corbett attempts to untimely raise here. Namely, *State v. Carter*, 156 Wn. App. 561, 234 P.3d 275 (2010), *State v. Berg*, 147 Wn. App. 923, 198 P.3d 529 (2008), *State v. Borsheim*, 140 Wn. App. 357, 165 P.3d 417 (2007), *State v. Hayes*, 81 Wn. App. 425, 914 P.2d 788, *review denied*, 130 Wn.2d 1013 (1996), and *State v. Ellis*, 71 Wn. App. 400, 859 P.2d 632 (1993), squarely address or touch on the *merits* of Corbett's jury instruction question. But the defendants in these cases did not propose the instruction they later sought to challenge for the first time on appeal. Moreover, where, as here, the context of the presentation of evidence and argument at trial eliminates a strained, prejudicial reading of an instruction, the jury's verdict is clear and any error is harmless.[12]

---

[11] Corbett argues that we cannot consider the State's closing arguments because "the State cannot cure through argument a double jeopardy violation that arises from defective jury instructions." Br. of Appellant at 15 (citing *State v. Berg*, 147 Wn. App. 923, 935-36, 198 P.3d 529 (2008)). But the State's closing arguments did not address the merits of Corbett's double jeopardy claim; rather, they highlight difficulties that Corbett has in showing prejudice as part of a constitutional manifest error analysis and presumably excuse the failure to object during the State's closing argument. But Corbett proposed the instruction he now seeks to challenge and the manifest error analysis does not apply.

[12] We note that Corbett does not raise an ineffective assistance of counsel claim related to the proposing of the jury instructions and that even if raised, such a claim would fail for lack of prejudice.

PROSECUTORIAL MISCONDUCT

¶34 Next, Corbett contends that the State committed misconduct at two different points during its rebuttal closing argument. Specifically, he argues that the State (1) abused its position and experience from other sex abuse cases by calling upon the jury to trust the State's judgment as to his guilt and (2) improperly told the jury they "would not be able to sleep at night if they did not decide that the state's charges were true." Br. of Appellant at 25. We disagree.

¶35 A defendant claiming prosecutorial misconduct bears the burden of establishing the impropriety of the prosecuting attorney's comments and their prejudicial effect. *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997), *cert. denied*, 523 U.S. 1007 (1998). In determining whether prosecutorial misconduct occurred, we first evaluate whether the prosecuting attorney's comments were improper. *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984). If the prosecuting attorney's statements were improper, and the defendant made a proper objection to the statements, then we consider whether the statements prejudiced the jury. *See Reed*, 102 Wn.2d at 145. Prejudice is established only where " 'there is a substantial likelihood' the instances of misconduct affected the jury's verdict.' " *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003) (quoting *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995), *cert. denied*, 518 U.S. 1026 (1996)). Absent a proper objection and a request for a curative instruction, the defense waives a prosecutorial misconduct claim unless the comment was so flagrant or ill intentioned that an instruction could not have cured the prejudice. *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995).

¶36 We review a prosecutor's allegedly improper comments in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions given. *Dhaliwal*, 150 Wn.2d at 578;

*Brown*, 132 Wn.2d at 561. A prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury. *State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991).

¶37 Corbett first challenges the following statements from the State's rebuttal:

[PROSECUTOR]: Defense counsel tells you that, you know, this is really a strange set of facts. Well, no offense, but you guys haven't read hundreds of police reports about sexual assaults that happen.

[DEFENSE]: Objection, Your Honor, this is outside –

THE COURT: It's argument. Overruled.

[PROSECUTOR]: You don't know what happens in these types of cases. What you do know is what was testified to. What you do know is the facts of this case. You know that it's not uncommon for a child who is a victim of rape to wait to tell what happened. You know it's not uncommon for that child to give different facts along the way. She is feeling out the waters. She has seen her world getting destroyed. She is asking for help. Her own mother did nothing.

7 RP at 889.

¶38 Corbett argues that the State (1) used its position and experience from other sex abuse cases to call on the jury to trust the State's judgment as to his guilt and (2) referenced evidence outside of the record. The State's comments about other cases are extremely vague and merely reflect the unfortunate reality that sexual abuse and sexual assault cases are commonplace. Taken in context, the State was actually rebutting Corbett's closing argument assertions that the facts of this case are "unusual" and "bizarre," raising concerns about J.O.'s credibility. The State rebutted Corbett's argument by indirectly highlighting the testimony of several expert witnesses who explained they have experience with hundreds of child sex abuse cases and did not feel there was anything unusual about J.O.'s development of the facts of her abuse since her first disclosure. Essentially, the State reminded the jurors that they are not

experts on sex abuse cases but that expert witnesses testified at trial about the normalness of J.O.'s alleged abuse. By doing this, the State was refuting Corbett's closing argument. And because of the indirect references to experts who testified at trial, it appears that the State was not referring to itself as the reader of hundreds of other prior sex abuse reports but, rather, reminding the jury about the extent of the experts' experience. Corbett has failed to show that the State's arguments were improper.

¶39 Moreover, Corbett failed to show any prejudice that did, or could have, stemmed from these statements, especially in light of a jury instruction that "[t]he lawyer's remarks, statements, and arguments are . . . not evidence" and that the jury must disregard any "remark, statement, or argument that is not supported by the evidence or the law." CP at 29. We presume a jury follows the court's instructions. *State v. Swan*, 114 Wn.2d 613, 661-62, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046 (1991).

¶40 Corbett also challenges some of the State's arguments made later during its rebuttal:

> You are the seekers of truth. You are the seekers of justice. You are to determine what the truth is, and you are to determine if that man sitting in that chair stuck his penis in her mouth, and how many times he did it.
>
> You have to be able to sleep with that decision at night for both the Defendant and for [J.O.].[13]

7 RP at 891.

¶41 Because Corbett did not object to these statements or request a curative jury instruction, the "flagrant or ill intentioned" standard applies. *Russell*, 125 Wn.2d at 86. Corbett provides no argument explaining his perceived prejudice of this statement, noting in his brief only that he "did not object to the argument that the jurors would not be able to sleep at night" and baldly asserting that "[t]he

---

[13] The State next described reasonable doubt and stated that the jury can rely on inferences when reaching its decision in a long analogy about putting together a puzzle.

statement regarding not being able to sleep at night" was flagrant and ill intentioned. Br. of Appellant at 25. We do not review assigned errors where arguments for them are not adequately developed in the briefs. *State v. Dennison*, 115 Wn.2d 609, 629, 801 P.2d 193 (1990).

¶42 We note that Corbett's paraphrasing of the State's argument mischaracterized the point that the State made. The trial transcripts show that the State was reminding the jury that it needed to be careful in reaching a decision *for both Corbett's and J.O.'s sake*; urging the jury to be careful and deliberate in reaching its decision for the sake of all concerned is not misconduct. Accordingly, Corbett's prosecutorial misconduct claim fails.

Sentencing: Crime-Related Prohibition

¶43 Last, Corbett challenges sentencing conditions that prohibit his contact with all minors insofar as it prohibits his contact with his biological minor children. Corbett has two sons who were ages 10 and 14 at the time of the February 2009 trial; his sons live with their mother. Specifically, Corbett argues that barring contact with his minor sons is not a valid crime-related prohibition because the State failed to show he is a danger to his sons. We disagree.

¶44 Former RCW 9.94A.505(8) (2003) authorizes the trial court to impose "crime-related prohibitions" as part of any sentence. " 'Crime-related prohibition' means an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted, and shall not be construed to mean orders directing an offender affirmatively to participate in rehabilitative programs or to otherwise perform affirmative conduct." Former RCW 9.94A.030(12) (2002). We review crime-related prohibitions for an abuse of discretion. *State v. Riley*, 121 Wn.2d 22, 37, 846 P.2d 1365 (1993). Abuse of discretion occurs when a decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *State v. Ancira*, 107 Wn. App. 650, 653, 27 P.3d 1246 (2001).

¶45 Parents have a fundamental right to raise their children without State interference. *See In re Custody of Smith*, 137 Wn.2d 1, 15, 969 P.2d 21 (1998) (recognizing a parent's right to rear his or her children without State interference as a constitutionally-protected fundamental liberty interest), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); *see also Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923). But parental rights are not absolute and may be subject to reasonable regulation. *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944). Limitations on fundamental rights must be "reasonably necessary to accomplish the essential needs of the state and the public order." *State v. Riles*, 135 Wn.2d 326, 349-50, 957 P.2d 655 (1998) (concluding that a prohibition on a convicted sex offender's contact with minors was not a justified limitation on freedom of association rights where the victim was not a minor (citing *Riley*, 121 Wn.2d at 37-38)), *abrogated on other grounds by State v. Sanchez Valencia*, 169 Wn.2d 782, 239 P.3d 1059 (2010). Sentencing courts can restrict fundamental parenting rights by conditioning a criminal sentence if the condition is reasonably necessary to further the State's compelling interest in preventing harm and protecting children. *Berg*, 147 Wn. App. at 942; *Ancira*, 107 Wn. App. at 654; *see State v. Letourneau*, 100 Wn. App. 424, 438, 997 P.2d 436 (2000); *see also In re Dependency of C.B.*, 79 Wn. App. 686, 690, 904 P.2d 1171 (1995) (stating prevention of harm to children is a compelling State interest), *review denied*, 128 Wn.2d 1023 (1996).

¶46 The decision in *Berg* by Division One of this court is instructive, and we note some important similarities with the current case. A jury convicted Berg of third degree child rape and two counts of third degree child molestation after he sexually molested a 14-year-old girl (A.A.) who lived with him. *Berg*, 147 Wn. App. at 927-30. Berg parented A.A., but she was not his biological child. *Berg*, 147 Wn. App. at 927, 942-43. Berg challenged the reasonableness of a no-contact order covering all minor

females, including his then 2-year-old biological daughter (A.B.). *Berg*, 147 Wn. App. at 927, 941. Division One upheld the no-contact order as a reasonable crime-related prohibition, stating,

> A.A. lived in the home where Berg was acting as her parent when the abuse occurred. By allowing Berg to be alone with A.B., who also live[s] in the home as his child, the court reasonably fear[s] that it would be putting A.B. in the same situation that A.A. was in when Berg sexually abused her. Thus, the trial court's order restricting contact was reasonably necessary to protect A.B.

*Berg*, 147 Wn. App. at 942-43.

¶47 Here, Corbett's sexual abuse of J.O. is analogous to Berg's actions. J.O. lived with Corbett as a stepdaughter for approximately seven months when she was six to seven years old. Just as Berg did, Corbett abused his parenting role by sexually abusing a minor in his care. There is no distinction between Berg's actions and Corbett's actions. We affirm the no-contact order based on the *Berg* court's analysis. The no-contact order is reasonably necessary to protect Corbett's children because of his history of using the trust established in a parental role to satisfy his own prurient desire to sexually abuse minor children. *See Berg*, 147 Wn. App. at 943-44.

¶48 Because we apply *Berg* to Corbett's case, we do not address arguments based on *Letourneau*, which is factually distinguishable. In *Letourneau*, Division One of this court struck down a no-contact order related to biological children because insufficient evidence existed to show it was reasonably necessary to protect her own children. 100 Wn. App. at 441-42. Letourneau did not have sex with a family member or with a child living in her home and evaluators did not find her to be a pedophile. *Berg*, 147 Wn. App. at 943 (citing *Letourneau*, 100 Wn. App. at 441-42). In contrast, Corbett's crimes were perpetrated against a minor he parented. The fact that Corbett sexually abused a child family member distinguishes *Letourneau* and provides the

necessary support to impose a prohibition on contact with his own children.

¶49 Insofar as Corbett argues that the no-contact order is not narrowly tailored to serve the State's interest in protecting children because it applies to his sons when his victim was a girl, we disagree. Here, the trial court had ample evidence to apply the no-contact order to all of Corbett's children regardless of their sex. The State showed that *all* of Corbett's children are at risk. Corbett's victim was a child whom he parented. Corbett committed the sexual abuse of J.O. while other children were in the home, specifically his then three-and-a-half-year-old stepson, D.O. And although the crimes for which Corbett was convicted involved a minor girl, his method of sexual intercourse was not gender specific. These facts sufficiently support the sentencing court's decision to prohibit Corbett's contact with all children, not just other people's children and not just his daughters, if he had any.

¶50 We also reject Corbett's reliance on *Riles* and *State v. Julian*, 102 Wn. App. 296, 9 P.3d 851 (2000), *review denied*, 143 Wn.2d 1003 (2001), for the proposition that his sons do not fall within his class of victims and, thus, that a prohibition on contact with his sons is not directly related to his crime. In *Riles*, the court struck a no-contact order with minors where the defendant's victim was a 19-year-old woman because it found no relationship between raping an adult and a future threat to minor children. 135 Wn.2d at 349-50. Specifically, our Supreme Court held that minor children were not within the same class of individuals as the victim, nor did children have a "relationship to the offender's crime." *Riles*, 135 Wn.2d at 350. In *Julian*, Division Three of this court upheld a no-contact order with minors related to a first degree child molestation conviction of a 4-year-old child but struck a prohibition on alcohol use because the trial court failed to make a connection between Julian's crime and alcohol use. 102 Wn. App. at 298-99, 305-06.

¶51 Here, Corbett's convicted crime is the sexual abuse of J.O., *a child whom he parented.* Because Corbett's victim was a minor girl *whom he parented,* his classes of victims are "minors he parents" in addition to "minor girls." Corbett's crime establishes that he abuses parental trust to satisfy his own prurient interests. The trial court's no-contact order prohibiting Corbett from having contact with his biological children is directly related to his crime because they fall within a class of persons he victimized. Accordingly, *Riles* and *Julian* do not apply.

¶52 Moreover, under our state's domestic relation laws, a parent's residential time with a child can be limited if the parent engages in certain behavior including sexual abuse of a child. RCW 26.09.191(2)(a). This reason alone could result in a limitation on Corbett's parenting rights under our state's civil laws. We see no reason that a criminal trial court cannot similarly consider such circumstances to justify a limiting contact order with one's own children.

¶53 Accordingly, we hold that the trial court did not abuse its discretion when imposing as a condition of Corbett's sentence a prohibition on contact with all minor children, including his biological children. We affirm this sentencing condition as a valid crime-related prohibition that does not unduly burden Corbett's fundamental parenting rights.[14] We also affirm his convictions.

ARMSTRONG and HUNT, JJ., concur.

---

[14] We note that, under Corbett's sentencing conditions, he can have supervised visits with his children so long as the visits are preapproved. Condition 25 states, "No contact with any minors *without prior approval* of the DOC/CCO and Sexual Deviancy Treatment Provider." CP at 84 (emphasis added). In addition, by the time Corbett is eligible for community custody release, his children will no longer be minors and his contact with his children will no longer be limited.