# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49564-3-II |
| Respondent, | |
| v. | |
| ROBERT VILLAFRANCA FERNANDEZ, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — A jury found Robert Fernandez guilty of second degree child molestation. Fernandez appeals his conviction and sentence, asserting that (1) his defense counsel provided ineffective assistance of counsel by failing to object to alleged hearsay testimony, (2) the court violated his constitutional right to parent by ordering that he not have in-person contact with his children as a condition of community custody, and (3) the trial court exceeded its authority and violated Fernandez's constitutional rights by imposing a curfew as a condition of his community custody. We affirm Fernandez's conviction, but we remand for the trial court to strike the curfew community custody condition.

## FACTS

### I. BACKGROUND

The victim, 13-year-old L.V., met Fernandez and his family 6 years before the assault. Fernandez and his wife have 2 children, an 11-year-old son and a 14-year-old daughter. L.V. and Fernandez's daughter were best friends. L.V.'s family and the Fernandez family were very close, and the two families went on camping trips and vacations together. Because L.V. was

very close with the Fernandez family, Fernandez's wife gave L.V. the nickname of "Daughter No.2." 1 Verbatim Report of Proceedings (VRP) at 90. L.V. often spent the night at the Fernandezes' home. The Fernandezes considered L.V. to be like family. And Fernandez loved L.V. like his own daughter.

On the night of the incident, L.V.'s mother and Fernandez held a birthday party for Fernandez's wife at Fernandez's home. During the party, L.V. and Fernandez's daughter made and wore T-shirts. The back of L.V.'s shirt stated, "Daughter No. 2 a/k/a best friend." 1 VRP at 90.

After the party, L.V. and her mother went to sleep in a bedroom. Around midnight, L.V. woke up and went into the living room. Fernandez's daughter and another friend were laying on the living room floor near a couch, and a movie was playing on a television. Fernandez was seated on a couch. L.V. took a seat on the couch to the right of Fernandez.

L.V. sat with her feet tucked under body with a blanket on her lap. At some point later, Fernandez pulled one of L.V.'s feet from under her and started rubbing it. L.V. then placed her other foot on Fernandez's lap. Fernandez began rubbing her feet and then progressed to rubbing her thigh. Fernandez then put his hands down L.V.'s pants and removed her pants and underwear. He touched L.V.'s vagina. L.V. then felt Fernandez stick his head under the blanket at which point L.V. sat up.

L.V. then got up from the couch and put her pants back on. Once L.V. was dressed, Fernandez apologized to L.V. numerous times and gave her a hug. Fernandez then asked L.V. not to tell his wife or his daughter.

L.V. went to the room where her mother was sleeping, retrieved her mother's cell phone, and called her father. As L.V. spoke to her father she began to cry. L.V. then went back into the bedroom where her mother was sleeping, woke her mother up and handed her the cell phone. Fernandez then came into the bedroom and asked to speak with L.V.'s mother.

Fernandez and L.V.'s mother left the bedroom but soon returned. Fernandez then asked L.V. and her mother not to tell his wife what had happened. Soon thereafter, Fernandez said that he was going to tell his wife himself and then left the room.

Fernandez's wife then entered the bedroom. While Fernandez's wife was in the room, L.V.'s mother asked L.V. if Fernandez pulled down her pants and if he had touched her vagina. L.V. responded "yes" to both questions. 1 VRP at 97.

After L.V. told Fernandez's wife and her mother that Fernandez had touched her, Fernandez came back into the room and began apologizing again. L.V. and her mother then left the Fernandez home.

Fernandez sent a Facebook message to L.V.'s mother and others the following night. The Facebook message stated:

> "I'm so SORRY.
> I did [make] a lot of mistakes in my life, but 1 mistake that I never thought I would ever do, and it's totally out of my control due to health or body chemical reaction. . . . All this shocked me, which I don't know how will effect [sic] my life and my family, or I'm not even sure if I can continue leaving [sic] like this at this time. I definitely won't forgive my self [sic] for what I did for as long as I leave [sic].
> I would like to say, I'm so sorry to everyone who I hurt, my friends, my family, to all the people I really care for.
> I hope all of you can forgive me including God, and I know I'll be going to hell for what I did.
> If not I understand.
> I will distance my self to everyone and . . . my family, to all the people I really care for.
> I hope all of you can forgive me . . . .

3

> I will distance my self to everyone and stay out of site [sic] as much as I can, I want you all to know that I did not plan or intent [sic] to do this and I am sorry, and I know this is not enough, I deserve to be beat killed or anything bad in the world, but please don't include my family specially [sic] my kids for friendship sake.
> Thank you all for everything[.]
> Goodbye[.]
>
> Love always Robert

Ex. 7. Fernandez also sent text messages to L.V.'s father. The messages stated:

> I didn't know what to say to you to my self. I have no idea for what I did but there is no excuse I didn't really know what [happened]it is so . . . hard to explain, it's not so me, doing this bullshit, I don't want to blame my medication or alcohol it's not forgivable to any father like you and i [sic] . . . I deserve to be killed or beat up. I cannot leave [sic] like this after what we go through like a family and this is what I did. I am so sorry. I hope you can forgive me. And I don't blame you if you don't. . . . I will try to set my self up to get my self out of this place, and if we cross our self [sic] before this happens, I don['t] blame you for killing me, because I deserve to die. I don't even know if I can forgive my self. I hope God forgives me for whatever I decide to do after this. Again I am so sorry to you, your family, specifically to my supposed to be my little daughter [L.V.]. Forgive me.

Ex. 20; 2 VRP at 157-58.

L.V.'s mother then contacted the police who began an investigation. During an interview with a detective, Fernandez stated that he did not remember much about the evening but that he remembered that he had L.V.'s "pants off of her." 2 VRP at 194. Fernandez also told the detective that he was "going to hell" for what he had done. 2 VRP at 211. Fernandez also stated, "I'm the one who did it, and I know she can't trust me anymore, but I hope she will forgive me." 2 VRP at 213.

Fernandez was placed into custody and called his wife from jail. During the conversation, Fernandez stated, "And it happened. I know that's not an excuse, but it happened. I don't know how; I don't know why. And I keep trying to figure out how. . . ." 3 VRP at 247.

4

No. 49564-3-II

Fernandez also stated, "It happened and there's nothing I can do. It's there." 3 VRP at 247. The State charged Fernandez with second degree child molestation and second degree attempted rape of a child.

## II. PRETRIAL HEARING

At a pretrial hearing, Fernandez's trial counsel conceded that L.V.'s statements made to her mother and parents on the night of the incident met the hearsay exception for excited utterances. Fernandez's trial counsel discussed the issue with the court:

> [TRIAL COUNSEL]: The defense would concede that statements that are made to her parents on the night of the incident would be excited utterances in this particular matter, and that would cover a phone call that [L.V] made to her father that evening and a discussion was had. And that would also include a discussion that [L.V] had with her mother upon waking her mother up that evening. And I believe that those would qualify as excited utterances, and so the defense doesn't have an objection to those statements.
>
> THE COURT: All right. So the Court doesn't see a need to rule at this time but doesn't anticipate an objection from the defense at the time that that testimony is elicited. I do understand that you were careful to clarify which conversations you were talking about. Presumably, the alleged victim talked to her parents later and I think we're only talking about the conversations that evening that you've outlined at this point; is that correct?
>
> [TRIAL COUNSEL]: Yes.

1 VRP at 24-25.

## III. TRIAL

At trial, the witnesses testified to the above facts. L.V.'s mother testified that while Fernandez's wife was in the bedroom, she asked L.V. if Fernandez pulled down her pants and asked if Fernandez touched her vagina. L.V.'s mother testified that L.V. responded yes to both questions. L.V's mother further testified that L.V. appeared to be "scared" and "shaky" and had a frightening appearance about her. 2 VRP at 98.

5

Fernandez testified that he did not remember anything about the incident except waking up and holding L.V. by the ankle and L.V.'s pants being at her ankles. Fernandez further testified that on the night of the incident L.V. had accused Fernandez of only holding her pants and nothing more. He said that at the time he sent the messages, no one had told him he was accused of touching L.V.'s vagina.

The trial court admitted into evidence the messages Fernandez sent to L.V.'s mother and father and the recording of the phone call between Fernandez and his wife while Fernandez was in custody.

The jury found Fernandez guilty of second degree child molestation.[1]

IV. SENTENCING

The court sentenced Fernandez to a total of 17.5 months in confinement, with an additional 36 months of community custody. During sentencing, the court stated:

> The nature of the offense is a crime against children. As such, the Court needs to identify what are the appropriate restrictions in order to protect any children including Mr. Fernandez' children. Ultimately, I think that it's appropriate for a full in-person contact to be restricted until we have the approval of the deviancy treatment provider and either the CCO (community custody officer) or the court, and so while Mr. Fernandez is in custody and in community custody, he will not have in-person contact with the two minor children until there's approval of the deviancy treatment provider and either the CCO or the court.
>
> In terms of other contact, the Court finds that contact through letters and phone calls and video conferences is permissible. I omitted other electronic contact for the time being and will leave that for the recommendations of the sexual deviancy provider. So my order restricts contact with the minor children with the exception of letters, phone calls, and video communications such as Skype. Circumstances can change and expand that after there's sexual deviancy treatment evaluation and treatment complied with.

---

[1] The jury was unable to reach a verdict as to the attempted rape of a child charge, and the trial court declared a mistrial as to that charge.

VRP (Oct. 20, 2016) at 34-35. In Appendix H to Fernandez's judgment and sentence order, the

court specifically ordered that Fernandez was to

> [h]ave no direct and/or indirect contact with minors absent supervision by a responsible adult aware of the conviction, informed consent of the minor's parent(s), approval of deviancy treatment provider and either the CCO or the Court. This includes the Defendant's minor children, except that he may have contact with his minor children via letters, email, phone calls and/or video communications such as Skype. This condition may [be] modified in the future by the court. Communications will be monitored and the CCO may discontinue contact if needed.

Clerk's Papers at 137.

The court also ordered that during community custody, Fernandez was to abide by a

curfew of l0 p.m. to 5 a.m. Without other explanation, the trial court stated that it was ordering

the curfew "in light of the specifics of this offense." VRP (Oct. 20, 2016) at 34.

Fernandez appeals his conviction and his sentence.

## ANALYSIS

### I. CONVICTION

Fernandez argues that his conviction should be reversed because his trial counsel

provided ineffective assistance of counsel by failing to object to L.V.'s mother's testimony

regarding L.V.'s statements the night of the incident. Fernandez asserts that L.V.'s mother's

testimony that repeated what L.V. said on the night of the incident was inadmissible hearsay and

that L.V.'s statements did not meet the excited utterance hearsay exception because L.V.'s

statements were deliberate responses to questions. Fernandez further argues that there was no

tactical reason for counsel's failure to object. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the

Washington Constitution guarantee effective assistance of counsel. *State v. Grier*, 171 Wn.2d

17, 32, 246 P.3d 1260 (2011). We review ineffective assistance claims de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

To show that he received ineffective assistance of counsel, a defendant must show (1) that defense counsel's conduct was deficient and (2) that the deficient performance resulted in prejudice. *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). A defense counsel's performance is deficient if it falls below an objective standard of reasonableness and was not based on a tactical decision. *State v. Beasley*, 126 Wn. App. 670, 686, 109 P.3d 849 (2005).

When reviewing deficiency, we strongly presume that counsel was effective. *State v. McLean*, 178 Wn. App. 236, 247, 313 P.3d 1181 (2013), *review denied*, 179 Wn.2d 1026 (2014). To rebut this presumption, the defendant bears the burden of establishing the absence of any conceivable legitimate tactic explaining counsel's performance. *Reichenbach*, 153 Wn.2d at 130. Additionally, where the appellant claims ineffective assistance based on his trial counsel's failure to object, the appellant must also show that such an objection, if made, would have been successful in order to establish deficient performance. *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007).

To show prejudice, a defendant must show a reasonable possibility that, but for counsel's purportedly deficient conduct, the proceeding's outcome would have differed. *Reichenbach*, 153 Wn.2d at 130. Because both prongs must be met, a failure to show either prong will end the inquiry. *State v. Fredrick*, 45 Wn. App. 916, 923, 729 P.2d 56 (1986).

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. ER 801(c); *State v. Hudlow*, 182 Wn. App. 266, 278, 331 P.3d 90 (2014). Hearsay is inadmissible unless an

exception applies. *Hudlow*, 182 Wn. App. at 278. Excited utterances are admissible under ER 803(a) as an exception to hearsay.

A statement qualifies as an excited utterance if (1) a startling event occurred, (2) the declarant made the statement while under the stress or excitement of the event, and (3) the statement relates to the event. *State v. Magers*, 164 Wn.2d 174, 187-88, 189 P.3d 126 (2008). The determination of the first and second elements can be established by circumstantial evidence such as "the declarant's behavior, appearance, and condition; appraisals of the declarant by others; and the circumstances under which the statement is made." *State v. Young*, 160 Wn.2d 799, 810, 161 P.3d 967 (2007).

The key determination to an excited utterance is often "whether the statement was made while the declarant was still under the influence of the event to the extent that the statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment." *State v. Woods*, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001). The statement need not be completely spontaneous and may be in response to a question. *State v. Bache*, 146 Wn. App. 897, 904, 193 P.3d 198 (2008).

Here, Fernandez claims that L.V.'s statements were deliberate responses to questions asked by L.V.'s mother and therefore her statements lack the "indicia of reliability" associated with true excited utterances. Br. of Appellant at 9. Although L.V.'s statements were in response to questions from her mother, it does not necessarily follow that her responses were inadmissible. *See Bache*, 146 Wn. App. at 904. Rather, the issue is whether L.V.'s statements were made while she was still under the influence of the incident and were not likely the result of fabrication. *See State v. Woods*, 143 Wn.2d 561.

L.V.'s statements to her mother were made on the heels of a clearly startling event; her molestation. Less than an hour had elapsed between the molestation and when L.V. made the statements to her mother. According to L.V.'s mother, L.V. appeared "shaky" and scared and had a "frightening appearance about her." 1 VRP at 98. This tends to show that L.V. was under the stress caused by the molestation at the time she made the statements.

Consequently, L.V.'s statements would likely have been admissible as excited utterances under ER 803(a)(2), and there is little likelihood that an objection to L.V.'s mother's testimony about L.V. statements would have succeeded. Thus, Fernandez does not establish that counsel's failure to object was deficient. Because Fernandez has failed to show that his trial counsel acted deficiently, his ineffective assistance of counsel claim fails.

## II. SENTENCE

Fernandez argues that the sentencing court exceeded its authority and violated his constitutional rights by imposing community two custody conditions. Fernandez asserts that the trial court improperly prohibited him from in-person contact with his children and improperly imposed a curfew. We agree in part and hold that the trial court did not violate Fernandez's constitutional rights in imposing the community custody condition prohibiting him from in-person contact with his children. However, the trial court exceeded its authority in imposing a curfew as part of Fernandez's community custody conditions. Thus, we remand this case for the trial court to strike the community custody curfew condition.

A.      *In-Person Contact with Biological Children*

Fernandez argues that the trial court violated his constitutional right to parent by imposing a community custody condition prohibiting him from having contact with his own

10

children as a condition of his community custody. Fernandez argues that the prohibition on contact with his children was not reasonably necessary to further the compelling governmental interest of protecting his children. The State argues that the condition was proper because Fernandez considered L.V. like a daughter and because the prohibition on contact was subject to modification on Fernandez's completion of a sexual deviancy evaluation and approval. We agree with the State.

The Sentencing Reform Act of 1981 authorizes the trial court to impose crime-related prohibitions. RCW 9.94A.505(9). Crime-related prohibitions are orders directly related to the circumstances of the crime. RCW 9.94A.030(12). We review whether conditions are crime-related for abuse of discretion. *State v. Warren*, 165 Wn.2d 17, 32, 195 P.3d 940 (2008). We review sentencing conditions that interfere with a fundamental constitutional right more carefully. *Warren*, 165 Wn.2d at 32.

Sentencing courts can restrict fundamental parenting rights by conditioning a criminal sentence if the condition is reasonably necessary to further the State's compelling interest in preventing harm and protecting children. *State v. Corbett*, 158 Wn. App. 576, 598, 242 P.3d 52 (2010). These conditions "must be sensitively imposed" so that they are "reasonably necessary to accomplish the essential needs of the State and public order." *Warren*, 165 Wn.2d at 32. Any "crime-related prohibitions affecting fundamental rights must be narrowly drawn" and "[t]here must be no reasonable alternative way to achieve the State's interest." *Warren*, 165 Wn.2d at 34-35.

Out of concern for children's welfare, courts have upheld no contact orders that limit a defendant's contact with children that belong in the same class as a minor victim. *See State v.*

*Berg*, 147 Wn. App. 923, 942-43, 198 P.3d 529 (2008); *see also Corbett*, 158 Wn. App. at 598. Courts have held an order restricting contact with other female children who lived in the home was reasonable to protect those children from the same type of harm when the defendant parented his victim and committed the abuse in the home. *Berg*, 147 Wn. App. at 942-43. Courts have also held an order restricting contact between a defendant and his children to be reasonable when the defendant used "trust established in a parental role" to satisfy his own prurient desire to sexually abuse the victim. *Corbett*, 158 Wn. App. at 599.

First, the trial court expressed the compelling interest in protecting minors from harm and stated that Fernandez's children may need protection as well. Prevention of harm to children is a compelling interest. *Corbett*, 158 Wn. App. at 598.

Next, Fernandez's children are in the same class of persons as Fernandez's victim and presents a similar need for protection from harm. Here, L.V. is in the same class of people as Fernandez's children, namely children whom Fernandez held a position of parental trust over. *See Corbett*, 158 Wn. App. at 599. L.V. is close in age to Fernandez's own daughter and the girls were like "sisters." 3 VRP at 305. L.V was treated like a member of the Fernandez family when the abuse occurred. L.V. would sleep over at Fernandez's house often and would vacation and go on road trips with Fernandez and his family. Fernandez testified that he loved L.V. and referred to L.V. as a daughter.

Finally, the community custody condition is narrowly drawn. *See Warren*, 165 Wn.2d at 34-35. The compelling interest articulated here is protecting the children of the community, including Fernandez's children. In Appendix H to Fernandez's judgement and sentence, the trial court ordered Fernandez to have no in-person contact with minor children, including his own

children. However, the court also allowed that the condition on contact could be modified in the future.

At sentencing, the court stated that because Fernandez's crime was a crime against children, the court needed to identify the appropriate restrictions to protect children including Fernandez's children. The court stated that it considered a full prohibition on in-person contact with his children appropriate until Fernandez had approval by a deviancy treatment provider and the approval of a corrections officer or the court.

The full prohibition on Fernandez's in-person contact with his children was subject to future modification. By providing Fernandez with a method to modify the condition of having no in-person contact with his children, the court recognized the compelling interest of protecting children but also balanced that interest and narrowly drew the sentencing condition with Fernandez's fundamental right to parent. *See Warren*, 165 Wn.2d at 34-35

Because the trial court's imposition of the community custody condition prohibiting Fernandez from in-person contact with his minor children was subject to future modification and the condition was reasonably necessary and narrowly tailored to achieve the compelling interest of protecting children, the trial court did not violate Fernandez's right to parent. Accordingly, we affirm this community custody condition.

B.      *Curfew as a Community Custody Condition*

Fernandez also argues that the trial court exceeded its authority and violated his constitutional right to freedom of movement by imposing a curfew restricting Fernandez to his residence at night as part of his community custody sentence. Fernandez asserts that the curfew is not crime related and therefore inappropriate. We agree that the trial court exceeded its

statutory authority to impose this condition, and we do not reach Fernandez's constitutional argument.

A trial court may only impose a sentence that is authorized by statute. *State v. Miller*, 159 Wn. App. 911, 930-31, 247 P.3d 457 (2011). RCW 9.94A.703(3)(f) provides the trial court with discretionary authority to require that defendants "[c]omply with any crime-related prohibitions." Under RCW 9.94A.030(10), a "[c]rime-related prohibition" is one that involves "conduct that directly relates to the circumstances of the crime for which the offender has been convicted." We review the imposition of crime-related prohibitions for an abuse of discretion. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007).

Here, the trial court ordered that during community custody, Fernandez is to abide by a curfew of l0 p.m. to 5 a.m. and that he must remain at his residence during that time. During sentencing, the court stated that it was imposing the curfew "in light of the specifics of this offense." VRP (Oct. 20, 2016) at 34. However, the court did not elaborate on what specific circumstances of Fernandez's offense warranted a curfew. This condition prohibited Fernandez from leaving his home in the evenings. But this prohibition does not directly relate to the circumstances of the crime because Fernandez was not outside of his home when he committed the crime for which he was convicted. Therefore, the trial court abused its discretion when it prohibited Fernandez from leaving his residence at night.[2]

---

[2] Because we determine that the trial court improperly imposed the community custody condition on statutory grounds, we need not reach Fernandez's constitutional arguments. *Brunson v. Pierce County*, 149 Wn. App. 855, 862, 205 P.3d 963 (2009).

No. 49564-3-II

Because the community custody condition imposing an in-home curfew on Fernandez is not crime-related, the trial court erred by imposing the condition. Accordingly, we remand to the trial court with instructions to strike the curfew condition.

We affirm Fernandez's conviction, but we remand with instructions to strike the community custody condition requiring Fernandez to abide by a curfew.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Bjorgen, C.J.

Melnick, J.

15