[No. 60729-4-I.   Division One.   December 29, 2008.]

THE STATE OF WASHINGTON, *Respondent*, v. EDWARD JONATHAN BERG, *Appellant*.

*Casey Grannis* (of *Nielsen, Broman & Koch, PLLC*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Heidi Jacobsen-Watts, Deputy*, for respondent.

¶1 AGID, J. — Edward Berg appeals his convictions for third degree rape of a child and third degree child moles-

tation. He contends that (1) the trial court's instructions subjected him to double jeopardy by allowing the jury to find him guilty of two counts of molestation based on a single act, (2) he was denied effective assistance of counsel by his attorney's failure to object to a detective's testimony about other sex abuse investigations, (3) his sentence exceeded the statutory maximum, and (4) the sentencing condition restricting contact with his biological daughter violated his fundamental right to the care and custody of his child. Because the court's instructions did not adequately inform the jury that it had to find a separate and distinct act for each of the identically charged molestation counts, we reverse and vacate one of the molestation convictions. But because Berg opened the door to the detective's testimony and there was no error, we affirm the other convictions. We must also remand for resentencing because the terms of confinement and community custody exceeded the statutory maximum, but we affirm the no-contact order as a crime-related prohibition that was reasonably necessary to protect Berg's biological daughter from similar abuse.

## FACTS

¶2 Edward Berg and Sharma Ayers have a two year old daughter, A.B. Ayers also has two other children, 14 year old A.A. and 10 year old M.H.[1] In January 2007, Ayers, Berg, and the three children moved to Bellevue. Also living with the family was Terry Wright, a friend of Berg and Ayers, who watched the children while Ayers attended school and Berg worked. Wright and A.A. had bedrooms downstairs and Ayers, Berg, M.H., and A.B. had bedrooms upstairs. But Berg and Ayers slept on the couches in the living room because Ayers had a bad back and Berg wanted to sleep in the same room with Ayers.

¶3 In March 2007, A.A. starting sleeping in the living room because she was afraid of spiders in her bedroom. A.A.

---

[1] These were their ages at the time of trial.

testified that during this time she would go to sleep in a chair but Berg would then carry her to the couch where he slept. She said that at first, she would lie on the couch with Berg and watch movies. Later, Berg started touching her on her chest and buttocks, both over and under her clothing. She testified that it happened every time she woke up in the middle of the night.

¶4 On April 9, 10, and 11, 2007, A.A. and M.H. were home during spring break. A.A. testified that on April 10 she was napping on the couch and when she awoke, she was on the bed in her mother and Berg's bedroom. She said she fell back to sleep, but when she woke up again, her lower legs were hanging off the edge of the bed, her pants and underwear were removed, and Berg was sitting on the floor. Berg then put his fingers in her vagina and licked her vagina. At that point, M.H. knocked on the door and told Berg that A.B. was awake. Berg asked A.A. if she wanted to continue, she said no, and he handed her clothes. She began to cry and then went to check on A.B. According to A.A., she did not tell her mother because she thought her mother would not believe her. Berg asked her repeatedly if she would forgive him.

¶5 In early May 2007, A.A. told her friends that Berg was molesting her. She had been with her friend Blair Davidson and Blair's boyfriend Andrew Arvidson at the skating rink when Blair's mother arrived to pick up Blair and Andrew. Berg was supposed to pick up A.A., but A.A. told Blair and Andrew that she was not going home and started walking to a nearby park. Blair and Andrew followed her, the three began talking, and Blair complained about her mother. When Andrew told the girls that they "didn't have it bad," A.A. then said something like "you don't know what I've been through." When Andrew asked what she meant, she told him to go away so she could talk to Blair privately. A.A. then told her Berg had molested her. After Blair told Andrew, the three talked some more, and Andrew said they should call the police.

¶6 When Blair's mother picked them up, Andrew told her what A.A. told them. They called the police, and Blair's mother called Berg to tell him she would take A.A. home. Ayers then called A.A.'s cell phone, but Blair's mother answered it and told her that they had stopped to eat. She did not tell Ayers about their report to the police because she did not think Ayers would believe A.A. When the police arrived, they interviewed A.A., Blair, Andrew, and Blair's mother separately. After the interviews, a detective arranged for A.A. to spend the night at Blair's house.

¶7 Based on the interviews, the police decided to arrest Berg. Berg and Ayers were standing outside of their house when Detective Michael Gordon arrived and attempted to arrest Berg. Berg did not want to be handcuffed and grabbed onto the handcuffs. After a brief struggle, Gordon eventually handcuffed him. While he was in the patrol car, Berg looked at the sky and said that this was probably the last time he was going to see the stars and "no matter what happens at this point[,] my life is never going to be the same."

¶8 The State charged Berg with one count of third degree rape of a child (Count I) and two counts of third degree child molestation (Counts II and III). At trial, A.A., Blair, Andrew, and Blair's mother testified to the events described above. At times, A.A.'s story was inconsistent, particularly about where the molestation occurred. She claimed that it happened only on the living room couch, but Blair testified that A.A. said it happened in her downstairs bedroom.

¶9 Berg's theory at trial was that A.A. was manipulative and unhappy at home, so she set him up by sleeping with him on the couch and falsely accused him of raping and molesting her. Ayers, Wright, and Berg all testified that Berg moved A.A. to the couch only once and that A.A. frequently crawled onto the couch to sleep with Berg. But Wright also testified that Berg and Ayers argued about A.A.'s sleeping habits and that Ayers was concerned about A.A.'s sleeping with Berg. Wright also told Berg that he did

not think the sleeping arrangements were strange because he knew the family but that outsiders might consider it odd. Additionally, Wright testified that Berg defended A.A. when she argued with Ayers and that Berg did most of the parenting.

¶10 Ayers testified that A.A. often ran away from home and did not want to come home so A.A. lied about Berg. Ayers described A.A. as emotionally and physically insecure and testified that she believed A.A. was manipulative and a danger to the stability of their home. Ayers also testified that the rape could not have occurred in her bedroom because the bed was covered with fabric pieces she had cut for a sewing project and they had not been disturbed.

¶11 Berg testified that he had parented A.A. and M.H. for the last four years and that he believed the children were more comfortable talking to him than to any other adult. He said that he allowed A.A. to sleep with him because she needed him. He also admitted that he had inadvertently touched A.A.'s breast once and that she pushed his hand away.

¶12 The jury found Berg guilty on all three counts. The court sentenced Berg to 48 months' confinement and 36 to 48 months' community custody on each count. As a condition of his sentence, the court prohibited contact with "[a]ny female minors without supervision of a responsible adult who has knowledge of this conviction."

## DISCUSSION

### I. *Instructional Errors and Double Jeopardy*

¶13 Berg contends that one of his two convictions for third degree child molestation must be reversed because the trial court's instructions allowed the jury to find him guilty of both counts based on a single act, violating his right to be free from double jeopardy. The State argues that Berg waived this issue for review because he did not object to the instructions at trial and this is not a claim of manifest constitutional error. Alternatively, the State ar-

gues that the jury sufficiently understood that different proof was required for each count because the State presented distinct facts to support each count and the court's unanimity instruction stated that the jury had to unanimously agree on the acts that had been proved beyond a reasonable doubt. The State also asserts that any instructional error was harmless.

¶14 While Berg did not object to the jury instructions at trial, his challenge to the instructions is properly before us as a claim raising an issue of constitutional magnitude.[2] The State argues that this is not a situation where no instruction was given, but rather is mere speculation about prejudice from an instruction that was given. The State is not correct. Berg's argument is precisely that the court omitted a necessary instruction. Thus, we review Berg's double jeopardy claim.

¶15 "The right to be free from double jeopardy . . . is the constitutional guaranty protecting a defendant against multiple punishments for the same offense."[3] If it is not manifestly apparent to the jury that the State is not seeking to impose multiple punishments for the same offense, the defendant's right to be free from double jeopardy may be violated.[4] Jury instructions " 'must more than adequately convey the law. They must make the relevant legal standards manifestly apparent to the average juror.' "[5] We review challenges to jury instructions de novo, within the context of the jury instructions as a whole.[6]

¶16 In *State v. Borsheim*, an opinion issued just days *after* the trial in this case, we held that where multiple

---

[2] *State v. Ellis*, 71 Wn. App. 400, 404, 859 P.2d 632 (1993) (similar double jeopardy claim was constitutional in magnitude and therefore reviewable despite defendant's failure to object to instructions at trial).

[3] *State v. Borsheim*, 140 Wn. App. 357, 366, 165 P.3d 417 (2007) (citing U.S. Const. amend. V; Wash. Const. art. I, § 9).

[4] *Id.* at 367.

[5] *Id.* at 366 (internal quotation marks omitted) (quoting *State v. Watkins*, 136 Wn. App. 240, 241, 148 P.3d 1112 (2006)).

[6] *State v. Jackman*, 156 Wn.2d 736, 743, 132 P.3d 136 (2006).

counts of sexual abuse are alleged to have occurred within the same charging period, an instruction that the jury must find " 'separate and distinct' " acts for convictions on each count was required.[7] We reiterated the rule articulated in *State v. Hayes*,[8] where we concluded that the jury was properly instructed on multiple counts of sexual abuse occurring within the same charging period because the "to convict" instructions for each count clarified that each count was based on " 'an occasion separate and distinct from that charged in [the remaining counts].' "[9]

¶17 In *Borsheim*, the "to convict" instructions did not contain this language, and we held that the remaining instructions did not cure the defect.[10] While noting that the unanimity instruction adequately informed the jurors that they had to be unanimous on the act that formed the basis for any given count, we concluded that this instruction did not "convey the need to base each charged count on a 'separate and distinct' underlying event."[11] Nor were we convinced that the instruction stating that " 'a separate crime is charged in each count' " informed the jury that each "crime" required proof of a different act.[12] Further, even though the "to convict" instruction stated that the elements must be proved " 'as to each count,' " we noted that it did not state that the element of sexual intercourse requires a finding of "a 'separate and distinct' act of sexual intercourse for each count on which a conviction is rendered."[13] Finally, we had concerns that the instructional

---

[7] 140 Wn. App. 357, 368, 165 P.3d 417 (2007).

[8] 81 Wn. App. 425, 914 P.2d 788, *review denied*, 130 Wn.2d 1013 (1996).

[9] *Id.* at 431 n.9 (alteration in original).

[10] 140 Wn. App. at 367.

[11] *Id.*

[12] *Id.*

[13] *Id.*

error was compounded by the use of a single "to convict" instruction that encompassed all four identical counts.[14]

¶18 We also distinguished an earlier case, *State v. Ellis*, which rejected a similar argument that the jury instructions allowed the jurors to use the same underlying act to convict the defendant on more than one count.[15] There, the court held that the instructions were adequate, stating, "It is our view that the ordinary juror would understand that when two counts charge the very same type of crime, each count requires proof of a different act."[16] The court in *Ellis* noted that the jury was instructed that a separate crime was charged in each count and that it was required to unanimously agree that at least one particular act had been proved for each count.[17]

¶19 We concluded that *Ellis* was distinguishable because there, the trial court gave separate "to convict" instructions for each count, the instruction for one of two identically charged counts stated that the act underlying that count had to have occurred " 'on a day other than [the other count],' " and the two other identically charged counts alleged that the charged act occurred during a different time period.[18] As we explained:

> Based both on the four separate "to convict" instructions and the distinguishing language therein contained, it is apparent that the trial court in the *Ellis* case was attempting to draw the jury's attention to the principle that each count charged the commission of a separate event. Here, in contrast, the trial court merely proffered a single "to convict" instruction, encompassing all four identical counts but listing the elements of the charged crime only once.[19]

---

[14] *Id.* at 368.

[15] 71 Wn. App. 400, 859 P.2d 632 (1993).

[16] *Id.* at 406.

[17] *Id.*

[18] 140 Wn. App. at 368-69 (quoting *Ellis*, 71 Wn. App. at 401-02).

[19] *Id.* at 369.

¶20 We also noted that the *Ellis* court acknowledged that the unanimity instruction there alluded to the requirement that each charged count must be based on a different act because it stated, " 'Although twelve of you need not agree that all the acts have been proved, you must unanimously agree that at least one particular act has been proved beyond a reasonable doubt *for each count.*' "[20] But because the unanimity instruction given in *Borsheim* did not contain the "for each count" language, we concluded that it was not adequate to avoid double jeopardy concerns.[21] Finally, we clarified that the *Ellis* decision did not hold that the "separate crime" instruction, standing alone, was sufficient to convey the need for the jury to base its decision on each charged count on a different underlying event. Rather, we explained, "the *Ellis* decision held that the instructions were adequate when viewed as a whole, considering both the separate and separately worded 'to convict' instructions as well as the 'for each count' language of the unanimity instruction."[22]

¶21 Here, the trial court gave two separate but identical "to convict" instructions for both counts of child molestation that stated in relevant part:

> To convict the defendant of the crime of child molestation in the third degree, as charged in count II, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That during a period of time intervening between March 1, 2007 through May 6, 2007, the defendant had sexual contact with A.A.

The court also instructed the jury:

> The State alleges that the defendant committed acts of child molestation in the third degree on multiple occasions. To convict the defendant on any count of child molestation in the

---

[20] *Id.* (quoting *Ellis*, 71 Wn. App. at 402).

[21] *Id.*

[22] *Id.* at 370.

third degree, one particular act of child molestation in the third degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved beyond a reasonable doubt. You need not unanimously agree that the defendant committed all the acts of child molestation in the third degree.

The court further instructed, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count."

¶22 Thus, as in *Borsheim*, the trial court here did not give a "separate and distinct act" instruction or otherwise require that the jury base each charged count on a "separate and distinct" underlying event.[23] And, as in *Borsheim*, the missing language potentially exposed Berg to multiple punishments for a single offense. Accordingly, we reverse and order the trial court to vacate one of the third degree molestation convictions.

¶23 We are not persuaded by the State's arguments to the contrary. The State first argues that Berg was adequately protected from double jeopardy because the prosecutor presented evidence of separate acts to support both convictions and explained in closing that the jury had to agree that two particular acts occurred. But the double jeopardy violation at issue here results from omitted language in the instructions, not the State's proof or the prosecutor's arguments. The State offers no authority for the proposition that evidence or argument presented at trial may remedy a double jeopardy violation caused by deficient instructions. And our courts have recognized that "[the] jury should not have to obtain its instruction on the law from arguments of counsel."[24] Rather, it is the judge's

---

[23] As noted above, the trial court did not have the benefit of the *Borsheim* decision when it gave these instructions to the jury.

[24] *State v. Aumick*, 126 Wn.2d 422, 431, 894 P.2d 1325 (1995).

" 'province alone to instruct the jury on the relevant legal standards.' "[25]

¶24 Next, the State argues that the court's unanimity instruction adequately protected Berg from double jeopardy because it contained the language, "[t]o convict the defendant on *any count* of child molestation in the third degree, one particular act of child molestation in the third degree must be proved beyond a reasonable doubt." This language was missing in the *Borsheim* unanimity instruction but was similar to the *Ellis* unanimity instruction, which stated, " '[Y]ou must unanimously agree that at least one particular act has been proved beyond a reasonable doubt *for each count*.' "[26] While the *Ellis* court referred to this language in rejecting the double jeopardy argument,[27] as we recognized in *Borsheim*, "that conclusion was based on consideration of instructions that differed in significant respects from those given in this case."[28] And unlike here and in *Borsheim*, the "to convict" instructions in *Ellis* contained language distinguishing the counts.[29] As we concluded in *Borsheim*: "The [*Ellis*] court's holding was based on the information given to the jurors by the instructions viewed as a whole, rather than by an element of a single instruction viewed in isolation."[30] Thus, the "for any count" language in the unanimity instruction here does not alone adequately protect against double jeopardy.

¶25 The State also argues that the language "*this act* occurred in the State of Washington" in the "to convict" instruction was sufficient to distinguish between counts.

---

[25] *State v. Clausing*, 147 Wn.2d 620, 628, 56 P.3d 550 (2002) (quoting *Burkhart v. Wash. Metro. Area Transit Auth.*, 324 U.S. App. D.C. 241, 112 F.3d 1207, 1213 (1997)).

[26] 71 Wn. App. at 402 (emphasis added).

[27] *Id.* at 406.

[28] 140 Wn. App. at 368.

[29] 71 Wn. App. at 402 (Count II stated, " 'on a day other than Count 1,' " and Counts III and IV contained different charging periods.); *Borsheim*, 140 Wn. App. at 368-69.

[30] 140 Wn. App. at 369 n.3 (citing *Ellis*, 71 Wn. App. at 401-06).

The State asserts that this language, taken with the instructions "as a whole, . . . told the jury it could convict Berg on both counts of child molestation counts *only* if the act that they found proved in count 2 was separate and distinct from the act they found proved in count 3." But this argument requires the jury to presume the "separate and distinct act" language, contrary to our holding in *Borsheim* that it must be included in the instructions.

■ ¶26 Finally, the State asserts that even if the court's instructions were deficient, they amounted to harmless error and reversal is unwarranted. But as Berg points out, the authority upon which the State relies applies harmless error analysis to unanimity instructional errors, not instructional errors that result in a double jeopardy violation. As we held in *Borsheim*, the remedy for the double jeopardy violation is to vacate the additional, identical count.[31]

## II.   *Ineffective Assistance of Counsel*

■ ¶27 To establish a claim of ineffective assistance of counsel, the defendant has the burden to show (1) that counsel's performance fell below a minimum objective standard of reasonableness and (2) that but for counsel's errors, there is a reasonable probability that the trial's result would have been different.[32] The defendant must establish both prongs to prevail on an ineffective assistance of counsel claim.[33]

---

[31] *Id.* at 371. The State also relied on *State v. Noltie*, 116 Wn.2d 831, 809 P.2d 190 (1991), during oral argument. But *Noltie* does not support the State's position. There, the defendant challenged the information—not the instructions—on double jeopardy grounds because it contained identically charged counts of child rape. The court held that the information did not violate double jeopardy because it was clear from the information, instructions, testimony, and argument that the State was charging the defendant with two different instances of rape and was not seeking to impose multiple punishments for the same offense. The court found significant that the separate "to convict" instructions included the language " 'in an incident separate from and in addition to any incident that may have been proved in [the other] count.' " 116 Wn.2d at 849 (emphasis omitted).

[32] *State v. West*, 139 Wn.2d 37, 42, 983 P.2d 617 (1999) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

[33] *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

¶28 On cross-examination, defense counsel asked Detective Gordon if any family members had come forward to corroborate A.A.'s allegations, and Gordon testified that none had. The prosecutor followed up, asking Gordon about his experience and if it was unusual for no family members to come forward in these types of cases. Gordon testified that it was not unusual. The prosecutor also asked Gordon whether he had cases where family members did not align themselves with the victim and whether that was common. Gordon responded:

> I've had experience where [a] family member saw what -- a mom saw what happened to her daughter by her husband and didn't -- and never reported it to the police.
>
>  . . . .
>
> That is not -- I wouldn't say that is common. I would say it's, you know, more common -- I mean, I have encountered cases where you've got maybe a sibling that saw something.
>
> And, of course, well, I don't want to get -- I can't get -- testify to what a sibling thinks, but where ultimately you found out through the course of an investigation that, you know, out of fear, you know, they didn't say anything, or out of, you know, frankly being asked by a victim, you know, don't say anything sometimes because of the fear, but every case is different, really.
>
> I mean, there's some commonalities, but I suppose you could say, but there's -- there are definitely times where, you know, somebody sees something and nobody says anything.
>
> And there's -- frankly, more often than not, you know, there are times, especially given what in terms of, you know, is it credible.
>
> And, as a detective that's done these investigations is what [A.A.] said to me as far as, you know, she's in this living room environment --

At that point, the court interrupted the testimony and the prosecutor told Gordon: "I'm going to caution you not to say . . . not to register an opinion about credibility. That's a job for the jury." Gordon then testified that he had investigated other cases where the family members of the suspect

aligned themselves with the suspect, rather than the victim. Defense counsel did not object to any of this testimony.

¶29 Berg argues that his attorney's failure to object amounts to ineffective assistance of counsel because this testimony was irrelevant and unfairly prejudicial. He contends that Gordon's testimony about past investigations was irrelevant because what family members did in other cases does not make the existence of any fact of consequence in Berg's case more or less probable. Relevant evidence is any "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[34] Generally, once a party has raised a material issue, the opposing party is permitted to explain, clarify, or contradict the evidence.[35] This is the long-recognized rule that when a party opens up a subject of inquiry, that party "contemplates that the rules will permit cross-examination or redirect examination . . . within the scope of the examination in which the subject matter was first introduced."[36] Otherwise, "[t]o close the door after receiving only a part of the evidence not only leaves the matter suspended in air at a point markedly advantageous to the party who opened the door, but might well limit the proof to half-truths."[37]

¶30 Here, Berg opened the door to Gordon's testimony about his experience in past cases. This testimony was in direct response to his testimony on cross-examination that none of A.A.'s family members aligned themselves with her. By eliciting testimony about his past experience with similar sex abuse cases that involved family members, the State sought to explain why that might be the case and to contradict Berg's suggestion that A.A.'s allegations were

---

[34] ER 401.

[35] *State v. Price*, 126 Wn. App. 617, 109 P.3d 27, *review denied,* 155 Wn.2d 1018 (2005).

[36] *State v. Gefeller*, 76 Wn.2d 449, 455, 458 P.2d 17 (1969).

[37] *Id.*

false. Thus, Gordon's testimony was admissible, and defense counsel did not err by failing to object. Berg has therefore failed to establish counsel's deficient performance, a necessary prong of his ineffective assistance claim.

¶31 The case Berg relies on, *State v. Sanchez*,[38] does not require a different result. That case was a prosecution for vehicular homicide in which the defendant sought to offer evidence of other accidents in the area on the night of his accident. The court held that the evidence was properly excluded as not probative of the defendant's negligence in his particular accident.[39] Unlike this case, evidence of the other accidents was not offered in response to questioning on this issue or to contradict the State's evidence. Rather, the State presented evidence that the defendant caused the accident by driving while intoxicated; thus, evidence of hazardous road conditions was not material to proof of a defense to the charges.[40] Here, the State offered evidence of Gordon's experience in past investigations only in direct response to Berg's cross-examination about the lack of corroborating evidence from family members and to contradict evidence suggesting that A.A. fabricated the allegations.

## III. *Sentencing*

¶32 Berg also challenges his sentence, contending that the combined term of confinement and community custody imposed exceeded the statutory maximum. The State concedes that the sentence exceeded the maximum[41] but contends that resentencing is not required. Rather, the

---

[38] 42 Wn. App. 225, 711 P.2d 1029 (1985), *review denied*, 105 Wn.2d 1008 (1986).

[39] *Id.* at 231.

[40] *See id.* at 227, 232-33.

[41] The statutory maximum for third degree child rape and third degree child molestation is 60 months. RCW 9A.20.021(c). But the court sentenced Berg to 48 months' confinement and 36-48 months' community custody, totaling 84-96 months.

State requests a remand for the trial court to clarify that the sentence may not exceed the maximum.

¶33 The authority upon which the State relies is *State v. Sloan,* which held that a trial court may impose a community custody term that theoretically exceeds the statutory maximum so long as the trial court adds clarifying language on the judgment and sentence that the total term of incarceration and community custody cannot exceed the maximum.[42] But in a case just filed, *State v. Linerud,* we abandoned the *Sloan* approach based on the defendant's argument that it leads to an indeterminate sentence.[43] In that decision, we concluded that such a sentence allows the Department of Corrections (DOC) to determine sentence length, which is not authorized by the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW.[44] While the SRA authorizes the DOC to make early release determinations, it requires the trial court to determine how long the sentence is, which must be a "determinate" or fixed term.[45] Thus, in accordance with our opinion in *Linerud,* we remand for the trial court to resentence Berg to a total term of confinement and community custody that does not exceed the statutory maximum.

## IV. *Order Prohibiting Contact*

¶34 Finally, Berg challenges the condition of his sentence prohibiting unsupervised contact with any female minor. The trial court denied Berg's request to make an exception for the children remaining in the household, explaining:

> [T]he prohibition would apply to them, too, unless I get some report back from a treatment provider that he is safe to be with them.

---

[42] 121 Wn. App. 220, 87 P.3d 1214 (2004).

[43] 147 Wn. App. 944, 197 P.3d 1224 (2008).

[44] *Id.* at 949-50.

[45] RCW 9.94A.030(21).

I mean, he was -- the offense was against a person that was essentially his child, not his child, but, I mean, it was in living in that same arrangement.

So to suggest that he could go back to what was virtually the same arrangement again with another young girl would only be putting him back in the same situation where he was convicted. I can't -- I can't do that.

But the court limited the order to Berg's contact with female children, noting that the prosecutor expressed no concern with Berg's contact with boys.

¶35 As a condition of a sentence, the trial court may impose " '[c]rime-related prohibition[s]' " and prohibit "conduct that directly relates to the circumstances of the crime for which the offender has been convicted."[46] Determining whether a relationship exists between the crime and the condition " 'will always be subjective, and such issues have traditionally been left to the discretion of the sentencing judge.' "[47] Thus, we review crime-related prohibitions for abuse of discretion.[48] "Abuse of discretion occurs when the decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons."[49]

¶36 A parent has a constitutionally protected fundamental right to raise children without State interference.[50] But in criminal cases, a sentencing court may impose limitations on this right when reasonably necessary to further the State's compelling interest in protecting children.[51] Here, as the trial court observed, A.A. lived in the home where

---

[46] RCW 9.94A.030(13).

[47] *State v. Parramore*, 53 Wn. App. 527, 530, 768 P.2d 530 (1989) (quoting DAVID BOERNER, SENTENCING IN WASHINGTON § 4.5 (1985)).

[48] *State v. Ancira*, 107 Wn. App. 650, 653, 27 P.3d 1246 (2001) (citing *State v. Riley*, 121 Wn.2d 22, 36-37, 846 P.2d 1365 (1993)).

[49] *Id.* (citing *State v. Hays*, 55 Wn. App. 13, 16, 776 P.2d 718 (1989)).

[50] *State v. Letourneau*, 100 Wn. App. 424, 438, 997 P.2d 436 (2000) (citing *In re Custody of Smith*, 137 Wn.2d 1, 15, 969 P.2d 21 (1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000)).

[51] *Id.* at 439-42.

Berg was acting as her parent when the abuse occurred. By allowing Berg to be alone with A.B., who also lived in the home as his child, the court reasonably feared that it would be putting A.B. in the same situation that A.A. was in when Berg sexually abused her. Thus, the trial court's order restricting contact was reasonably necessary to protect A.B.

¶37 Berg relies on *State v. Letourneau* and *State v. Ancira*, which held that the trial court erred by imposing orders prohibiting the defendants from contacting their biological children.[52] But in both of those cases there was insufficient evidence that an order was reasonably necessary to protect those children from harm. In *Letourneau,* the victim was Letourneau's student with whom she had sex; he was not a family member and did not live in the home. Letourneau's evaluators were also unanimous that she was not a pedophile and nothing in the record suggested she posed a threat to her own children.[53] In *Ancira,* the order prohibiting contact was based solely on the children's having witnessed domestic violence between the defendant and their mother, without a showing that the no-contact order was reasonably necessary to protect the children from the harm of witnessing future domestic violence.[54] So long as the defendant complied with the order prohibiting contact with his wife, the court had no reason to believe allowing him contact with his children would cause them further exposure to domestic violence.[55]

¶38 But here, Berg lived with A.A. and committed the abuse in the home. An order restricting contact with other female children who lived in the home was therefore reasonable to protect those children from the same type of harm. Additionally, unlike in *Letourneau*, this record contains no evidence indicating that Berg is not a danger to

---

[52] *State v. Letourneau*, 100 Wn. App. 424, 427, 997 P.2d 436 (2000); *State v. Ancira*, 107 Wn. App. 650, 654-55, 27 P.3d 1246 (2001).

[53] *Letourneau*, 100 Wn. App. at 441-42.

[54] 107 Wn. App. 650.

[55] *See id.* at 655.

A.B.[56] The order is also sufficiently tailored to the crime. Even though it restricts all forms of contact, not just physical contact, it addresses the potential for the same kind of abuse at issue here, which Berg was able to achieve by exploiting a child's trust in him as a parental figure. Prohibiting Berg from having any unsupervised contact with A.B. prevents him from again fostering this kind of trust and putting her at the same risk of harm.

¶39 We reverse and vacate one count of third degree molestation, remand for resentencing to a term within the statutory maximum, and affirm the order prohibiting contact.

SCHINDLER, C.J., and DWYER, J., concur.

Reconsideration denied February 5, 2009.

---

[56] But we note that the trial court indicated that it would reconsider the no-contact order if Berg is deemed not to be a risk to A.B.