IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                Respondent,<br><br>        v.<br><br>JOSE HERNANDEZ-ESCOBAR,<br><br>                Appellant. | No. 86001-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Jose Hernandez-Escobar was convicted of three counts of rape of a child in the first degree and one count of child molestation in the first degree. Hernandez-Escobar challenges the trial court's conclusion that an 18-year-old juror who had lived both in Arizona with his mother and in Washington with his father was a "resident" eligible to serve on the jury. Hernandez-Escobar also claims his convictions constitute double jeopardy because for count 4 for child molestation, the court did not instruct the jury to rely on acts separate and distinct from those used to convict him on count 3 for rape of a child, even though counts 3 and 4 had the same charging period and both relied on evidence of the same acts. He further argues that his right to due process was violated because the court refused to poll the jurors to state the factual basis of their verdicts. Finally, Hernandez-Escobar challenges the imposition of community custody conditions requiring him to remain within geographic boundaries and allowing home searches. We affirm.

FACTS

In May 2020, when A.C.D. was 11 years old, her mother discovered pornography on her Google search history on her phone and asked her about it. Initially, A.C.D. did not tell her mother why she had the searches on her phone.[1] Her mother was "really mad, really upset," told A.C.D. she did not expect that from her, and left the room. A.C.D.'s sister then began asking her questions about what was found on her phone, and A.C.D. felt "overwhelmed" and "like [her mother and sister] were disappointed in [her]." As a result, she "blurted it out to [her] sister" that her mother's boyfriend, Jose Hernandez-Escobar, had been sexually abusing her. Her sister "got very upset" and told their mother Hernandez-Escobar had been sexually abusing A.C.D. for the past "three, four years" and that was "the only reason that [pornography] was on [her] phone was because of him."

According to A.C.D., the first incident occurred when she was nine years old. Shortly after she had her first period, Hernandez-Escobar came to her house while she was alone and "laid [her] down on the bed saying that [she] had just become a young lady that he could make [her] feel more like it." She explained that Hernandez-Escobar "took off [her] clothing and laid paper towels under my bottom half," and then inserted "his fingers into [her] private area," i.e., her "vagina." After about 10 or 15 minutes, Hernandez-Escobar put his mouth on her vagina, "insert[ed] his tongue" for about five minutes, and then inserted his penis into her vagina.

---

[1] At trial, A.C.D. testified that the pornography searches were on her phone because Hernandez-Escobar would show her the videos and tell her to watch because they would give her "some ideas," which she took to mean "he wanted [her] to watch and maybe learn something."

A.C.D. testified that the rapes "started occurring more often[]" including on one occasion when her mom was in the shower. She explained that Hernandez-Escobar would lean her against the wall in the hallway while her mom showered "so he could hear once she shut off the water," and would "have [her] standing up with [her] legs slightly spread so he could . . . have easier access."

A.C.D. testified that Hernandez-Escobar also touched "[her] thighs or [her] breasts" and would "glide his hands up [her] legs to reaching the point where [her] vagina was," underneath her clothing. She explained that he would "do a rubbing motion or just gliding his fingers up and down," underneath her clothing. She also testified that he "rolled up [her] nightgown, and he had, I guess . . . moved [her] underwear to the side and he put his fingers over [her] vagina."

A.C.D. testified that the last rape occurred when she was 11 years old; she recalled Hernandez-Escobar stopped at a gas station and "bought a small box of condoms" and then went to a storage unit where he asked her to sit down. A.C.D. testified that she refused to sit down and at that point Hernandez-Escobar "grabbed [her] . . . laid [her] down and started undressing [her]" before he put on a condom. Hernandez-Escobar then "opened up [her] legs and [she] was already undressed on [her] bottom half. And he inserted his penis into my vagina and he said that [she] shouldn't be so stingy or so tough."

Hernandez-Escobar was charged with three counts of rape of a child in the first degree. The State later amended the charges to add a fourth count of child molestation in the first degree. The relevant charging period for all of the charges was between January 1, 2017, and May 21, 2020.

3

Given the expansive charging period, Hernandez-Escobar filed a motion for the court either to compel the State to elect a specific act for each count or to instruct the jury to unanimously agree to a specific act and give a Petrich[2] instruction. The court agreed that the State would need to make an election as to each count or the court would provide a Petrich instruction.

Voir dire began in early April 2023. At the conclusion of voir dire, on May 9, the jury was seated, including juror 8. On the morning that trial testimony was to start, May 15, juror 8 sent an email to the court stating that his "primary residency is in Wickenburg[,] Arizona with my mom. My driver['s] license and motorcycle license were all obtained the past 2 years in Yavapai [C]ounty, AZ." The email continued, "I only have a WA ID card. I come up for the summers to live with my dad. Over the course of the past 12 months, I have only lived with my dad in King County for approximately 3 months." Before impaneling the jury, the court and the parties conducted additional voir dire to clarify juror 8's eligibility. The trial court concluded that juror 8 was a resident eligible to serve, noting that he was born in Washington, lived the majority of his life in Washington, and "[t]hat was clearly his permanent residence." Further, the court found that he did not show any intent to "fully change[ ] his residence from Washington to Arizona." It also noted that juror 8's contact with Washington and his intent to stay in Washington indicated that "his contacts are sufficient statutorily in my view to meet the requirements for residence under [RCW] 2.36.070," the statute addressing requirements for juror competency.

---

[2] State v. Petrich, 101 Wn.2d 566, 683 P.2d 173 (1984), abrogated in part on other grounds by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988); see also 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 4.25 (5th ed. 2024) (WPIC).

Later, after the parties rested, the court instructed the jury that the State was relying on a single act to prove count 1, rape of a child in the first degree, and that the jury "must unanimously agree that this specific act was proved." The court gave the same instruction for count 2. For counts 3, rape of a child in the first degree, and 4, child molestation in the first degree, because the State alleged the defendant committed acts constituting each crime, respectively, on multiple occasions, the court instructed the jury that to convict, one particular act must be proved beyond a reasonable doubt, and the jury must unanimously agree which act had been proved. Further, the jury instructions for counts 1, 2 and 3—the three counts of rape of a child in the first degree—all included language instructing the jury to rely on "an occasion separate and distinct" from those charged in the other two counts for rape of a child to support its decision. The jury was not similarly instructed as to count 4, for child molestation in the first degree.

The jury returned a verdict of guilty on all counts. After the court read the verdicts, Hernandez-Escobar asked the court to conduct polling "to determine what conduct each juror indicates constituted the offense." The court declined defendant's request and conducted only a poll to ensure the jury's verdicts were their own.

The court imposed an indeterminate sentence of 280 months to life in prison for each of counts 1, 2, and 3 and an indeterminate sentence of 198 months to life for count 4, to be served concurrently. Additionally, the court imposed conditions of community custody, including that Hernandez-Escobar "[r]emain within geographic boundaries, as set forth in writing by the Department of Correction Officer [sic] [(DOC)] or as set forth with SODA [(Stay Out of Drug Areas)] order." It also imposed community custody conditions particular to sex offenses, which require Hernandez-Escobar to "[c]onsent to

5

DOC home visits to monitor compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of the residence, in which the offender lives or has exclusive/joint control/access."

Hernandez-Escobar timely appeals.

ANALYSIS

Hernandez-Escobar raises several issues on appeal. First, he contends that the trial court erred by seating a juror who was ineligible because he did not meet the mandatory residency requirements. Second, he argues that his convictions for counts 3 and 4 constitute double jeopardy because the State alleged he committed acts constituting each crime on multiple occasions during the same lengthy charging period, but the court failed to instruct the jury to rely on occasions "separate and distinct" from each other to convict him on count 3 for rape of a child and on count 4 for child molestation, respectively. Third, he argues that his due process rights were violated because the trial court declined to direct the jurors to state the factual basis of their verdict. Finally, he argues that the trial court erred in imposing various community custody conditions.

I. Inquiry into Juror Eligibility

When the trial court learned of juror 8's email questioning his eligibility to serve, the court conducted additional voir dire. In his juror questionnaire, juror 8 listed his residence as Kent, Washington, and noted that he had lived in King County, Washington, for 18 years. The court confirmed with juror 8 some of his questionnaire answers, including that he was 18 years old and was born in Renton. Juror 8 further relayed that he had been spending "[a]bout 60 percent of the time over, the past, like,

four years" in Arizona where he was attending school before the start of the COVID-19 pandemic, at which point he began attending school online and obtained his general educational development (GED) high school equivalency from Green River College. Additionally, juror 8 stated that he initially held a Washington ID so he could fly to Arizona by himself and subsequently obtained an Arizona driver's license. When asked whether he owned any property in Arizona or had paid for any utility bills under his name, juror 8 answered in the negative. He also stated that he had not yet registered to vote because he was newly of age but noted that if he did register to vote it would be in Washington. Further, when Hernandez-Escobar asked where he thought of as home, between Arizona and Washington, juror 8 replied that he would "probably give my Kent address." Additionally, when asked whether he intended to stay permanently in Washington, juror 8 answered, "Correct."

At the conclusion of the individual voir dire, the State took the position that juror 8 was a Washington resident and suggested the defendant could waive future challenges to the issue of the juror's qualifications. Hernandez-Escobar stated that he was "not waiving future challenges, at this point I don't think I have a basis to seek his removal, if that makes sense." The court agreed, "It does because I don't think you do either actually." The court explained that although "residency . . . can be fluid," a person's residency "is determined based on their contacts to that place, on the amount of time they spend the[re]." The court noted that juror 8 was born in Washington, lived the majority of his life here, and "[t]hat was clearly his permanent residence," and despite "spending more time in Arizona, . . . [he] never fully changed his residence from Washington to Arizona." Based on juror 8's contact with Washington and his intent to

7

stay in Washington, the court concluded he satisfied the statutory residence requirements to be eligible as a juror.

Hernandez-Escobar claims it was constitutional error to seat a juror who was not a resident "of the county." In response, the State argues that Hernandez-Escobar waived the issue and cannot assert this claim for the first time on appeal because he cannot establish manifest constitutional error.

We "may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a). "While this rule insulates some errors from review, it encourages parties to make timely objections, gives the trial judge an opportunity to address an issue before it becomes an error on appeal, and promotes the important policies of economy and finality." State v. Kalebaugh, 183 Wn.2d 578, 583, 355 P.3d 253 (2015). However, there are exceptions; for example, even without an objection below, we will review a manifest error affecting a constitutional right. Id. (citing under RAP 2.5(a)(3)).

Here, even though Hernandez-Escobar did not lodge a formal objection or challenge, the trial court was apprised of the issue because juror 8 raised it. The parties and the court conducted additional voir dire to elicit the necessary information to decide the issue. Thus, the trial judge had the opportunity to address the issue, in keeping with the policies underlying appellate review under RAP 2.5(a). And even if after the additional voir dire, Hernandez-Escobar stated, "I don't think I have a basis to seek his removal," with which the court agreed, he also explicitly stated he "was not waiving future challenges." Given this record, we exercise our discretion to review the claim and do not decide whether Hernandez-Escobar's challenge is of a constitutional magnitude.

"We review a trial court's fact-based rulings for abuse of discretion." State v.
Nemitz, 105 Wn. App. 205, 210, 19 P.3d 480 (2001). If the trial court's ruling is based
on an interpretation of the law, we review that decision de novo. Id. See also Matter of
Lewis, 200 Wn.2d 848, 858, 523 P.3d 760 (2023) (we review constitutional provisions
de novo); Brock v. State, 33 Wn. App. 2d 389, 397, 561 P.3d 1226 (2025) (we review a
trial court's interpretation and application of a statute de novo). If the trial court's ruling is
based on an erroneous view of the law or involves application of an incorrect legal
analysis, it necessarily abuses its discretion. State v. Kinneman, 155 Wn.2d 272, 289,
119 P.3d 350 (2005). Further, a "material departure from statutory jury selection
requirements is presumptively prejudicial and requires reversal and remand for a new
trial." City of Bothell v. Barnhart, 172 Wn.2d 223, 233, 257 P.3d 648 (2011).

Article I, section 22 of the Washington Constitution guarantees a criminal
defendant the right to a trial "by an impartial jury *of the county*" where they were
charged. (Emphasis added). Similarly, a juror is statutorily competent to serve unless
they are "not a resident of the county" where they were summoned, along with other
requirements. RCW 2.36.070(3)[3]; see also State v. Newcomb, 58 Wash. 414, 418, 109
P. 355 (1910) ("[T]he words 'jury of the county,' as used in our constitution, have never
been held to mean more than that the jurors when summoned, should come from some
part of the county."). Further, under article I, section 22, the jurors are "of the county"
only if they are resident in the county where the criminal conduct allegedly occurred.
Barnhart, 172 Wn.2d at 233. For example, in Barnhart, the alleged offense had occurred

---

[3] RCW 2.36.070 provides that a person is competent to serve as a juror unless they are not (1) eighteen years old; (2) a citizen of the United States; (3) a resident of the county where they were summoned; (4) able to communicate in English; or (5) were convicted of a felony and have not had their civil rights restored.

in the city of Bothell, which is split between King and Snohomish Counties. Two of the jurors were from King County. Id. at 226-28. The dispute was over the plain meaning of "county" in article I, section 22. The City of Bothell argued that the term "county" meant "the communities served by the court," but the Supreme Court agreed with Barnhart that under article I, section 22, the jurors from King County were not "of the county" of Snohomish, where the criminal conduct allegedly occurred. Id. at 232-33.

Hernandez-Escobar argues that juror 8 "lacked the necessary hallmarks of residency" to be "of the county." In particular, Hernandez-Escobar contends that at the time juror 8 arrived in Washington on April 3, he lacked connections to King County and he had not taken any steps to be considered a resident of the county. However, the "of the county" constitutional requirement is fairly broad; while it excludes people who are not residents of that particular county, it does not define what is sufficient to be a resident therein. And the history of the statutory juror competency requirements suggests that the legislature did not intend the current statute to include a temporal component to residency. Historically, the statutory definition of a "resident" did include a temporal requirement; for example, in 1909, a person was competent to serve on a jury if they were "[a] resident of the county in which he is called for service for more than one year preceding such time." LAWS OF 1909, ch. 73, § 1. The various iterations of the juror qualifications statute retained the temporal residency language for until it was amended in 1988 to require only that the person be a "resident of the county." LAWS OF 1988, ch. 188, § 7. And the current statute continues to omit any prior temporal limitation on residency. RCW 2.36.070(3). "It is a well-recognized rule of statutory construction that 'where a law is amended and a material change is made in the wording, it is presumed

10

that the legislature intended a change in the law.' " <u>Guillen v. Pierce County</u>, 144 Wn.2d 696, 723, 31 P.3d 628, 34 P.3d 1218 (2001) (quoting <u>Home Indem. Co. v. McClellan Motors, Inc.</u>, 77 Wn.2d 1, 3, 459 P.2d 389 (1969)), <u>rev'd in part on other grounds</u>, 537 U.S. 129 (2003).

Here, juror 8 was born in Washington but also had many ties to Arizona. He wrote to the court that "his primary residency" was Arizona, including that he had spent "[a]bout 60 percent of the time over, the past, like, four years" in Arizona. While juror 8 held a Washington ID to allow him to fly to Arizona by himself, he explained that he subsequently obtained an Arizona driver's license because it was easier to take the driver's test there given his physical presence there.

On the other hand, juror 8 listed in his juror questionnaire that he had lived in King County for 18 years and had been enrolled in the Kent School District. He confirmed he did not own any property in Arizona or pay for any utility bills under his name. He obtained his GED from Green River College, in Washington. Juror 8 had not yet registered to vote because he had turned 18 less than a month before he was selected a juror but intended to register in Washington. Further, when asked if he had to choose which he felt was his home, Arizona or Washington, juror 8 replied, "Probably Kent." And when asked where he wanted to stay permanently, juror 8 confirmed that he planned to stay in Washington and did not plan to make Arizona his home.

In concluding that juror 8 was eligible, the trial court explained,

[Juror 8] was born in Washington. He lived the majority of his life in Washington. That was clearly his permanent residence, at the very least, up until the time that he started moving around. But I don't see any intent from him to change his residence from Washington. He started spending more time in Arizona [ ] but never really fully changed his residence from Washington to Arizona. . . . But he was enrolled as a student essentially in

11

a local school district in King County as of his graduation. . . . He's planning to stay here. . . . Essentially, his documents from Arizona were just a matter of convenience rather than coming back up to Washington.[4]

Therefore, the court concluded that juror 8's "contacts are sufficient statutorily to meet the requirements for residence."

The court's conclusion that juror 8 was a resident of the county was not a "material departure" from the statutory juror qualification requirements—indeed, the court explicitly considered and *applied* the requirement of residency—and, thus, it was not presumptively prejudicial. See Barnhart, 172 Wn.2d at 233. The court's determination that juror 8 was a resident of King County was a fact-based ruling based on the information elicited through voir dire. We review this decision for abuse of discretion. Nemitz, 105 Wn. App. at 210.[5] We conclude that the trial court did not abuse its discretion in concluding juror 8 was a resident of King County and seating him as a juror.

## II. Claims Relating to Factual Basis for Charges

Hernandez-Escobar raises various constitutional claims based on the fact that the charging period for all four counts was the same and involved the same people. First, he claims that "[w]ithout a clear jury finding that count four rested on separate and distinct acts than the other charges, it violates double jeopardy to punish [him] multiple times for the same offense." He also challenges the court's refusal to require the State to specify the underlying act for each count or to require juror unanimity. Second, he

---

[4] A person's place of birth is not relevant to determining a person's current residency. However, here, it was a question included on juror 8's juror questionnaire and was a fact considered by the trial court.

[5] See also Golden Gate Hop Ranch, Inc. v. Velsicol Chem. Corp., 66 Wn.2d 469, 472-73, 403 P.2d 351 (1965), cert. denied, 382 U.S. 1025 (1966) (in case involving alleged juror misconduct, holding, "Since the evidence on the matter was conflicting, it was necessary that the trial court make a finding of fact as to whether the alleged misconduct occurred; and this court will accept the trial court's finding.").

argues that his right to due process was violated because the trial court refused to poll the jury to ascertain the factual basis of their verdicts. We reject both claims.

A. Juror Unanimity

"In 'multiple acts' cases, the jury must unanimously agree as to which incident constituted the crime charged." State v. Bobenhouse, 166 Wn.2d 881, 893, 214 P.3d 907 (2009). "When the evidence indicates that several distinct criminal acts have been committed, but defendant is charged with only one count of criminal conduct, jury unanimity must be protected." Petrich, 101 Wn.2d at 572. In such a circumstance, "the State must elect the act on which it relies to convict the defendant, or the trial court must provide a unanimity instruction—a Petrich instruction."[6] Bobenhouse, 166 Wn.2d at 893.

For example, in Bobenhouse, the defendant was charged with rape of a child in the first degree, and on review, the court explained that the alleged victim "may or may not have attested to multiple acts, each of which is capable of satisfying the material facts required to prove the crime of rape of a child in the first degree," but that at closing the State argued that the alleged acts "were not separate and each occurred on a weekly basis." 166 Wn.2d at 893-94. The Bobenhouse court held that a Petrich instruction was required because the State's closing argument and the alleged victim's testimony made "it inconclusive as to whether [the defendant] was being charged based on one act or multiple acts of child rape." 166 Wn.2d at 894.

Here, Hernandez-Escobar claims the trial court's jury instructions permitted the jury to convict him of count 4 by relying on the same acts that constituted counts 1

---

[6] In State v. Petrich, the court described such an instruction: "[I]f the jury is instructed that all 12 jurors must agree that the same underlying criminal act has been proven beyond a reasonable doubt, a unanimous verdict on one criminal act will be assured." 101 Wn.2d at 572.

through 3. In particular, he notes the State did not elect an act for counts 3 and 4 and the trial court did not instruct the jury that for count 4, it needed to rely on acts that were separate and distinct from acts that were the basis for counts 1, 2, or 3. He notes that in its closing, the State discussed evidence of "sexual contact occurring close in time as part of one course of events [that] could constitute sexual intercourse as well as molestation" and directed the jury to "pick one of the acts" and agree that it was molestation. Thus, he asserts that the jury could have convicted on count 4 for child molestation based on the same conduct supporting counts 1 through 3.

However, as to both counts 1 and 2, the trial court instructed that "the State relies upon evidence regarding a single act constituting this count" and noted that "you must unanimously agree that this specific act was proved." During closing, the State explained that "separate and distinct" means "that count one is based on an occasion separate and distinct from counts two and three, count two is based on an occasion separate and distinct from count[] one and count[] three, and then count three is based on an occasion separate and distinct from count[] one and count[] two." Moreover, the State made clear elections for counts 1 and 2 as to specific acts of penetration that established rape of a child during closing. First, as to count 1, the State discussed the evidence of the first time A.C.D. was raped, including that Hernandez-Escobar "placed a paper towel under her bottom, he inserted his fingers into her vagina, then put his mouth on her vagina," and that after inserting his penis into A.C.D., he told her "he would make [her] a young lady." Second, as to count 2, the State discussed the evidence of the last time A.C.D. was raped at the storage unit, where he took out a "condom with purple plastic packaging" and then "forced his penis inside of her," and

then disposed of the condom at a parking lot. Thus, the State properly elected a single act for count 1 and a separate single act for count 2.

B. Double Jeopardy

Rape of a child in the first degree requires proof of "sexual intercourse" with a child. RCW 9A.44.073(1). Sexual intercourse can be proved with evidence of some form of penetration, but it can also be proved by "any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another." Former RCW 9A.44.010(1)(c) (2020).[7] By contrast, child molestation requires proof of "sexual contact" with a child. RCW 9A.44.089(1). Sexual contact means "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." Former RCW 9A.44.010(2) (2020).[8] Thus, unlike rape of a child, the crime of child molestation does not require penetration or that the sexual contact with the child be with the mouth or anus of another.

Accordingly, a charge of child rape and child molestation based only on evidence of penetration does not constitute double jeopardy "because in that situation rape and molestation are separate offenses." State v. Sanford, 15 Wn. App. 2d 748, 753, 477 P.3d 72 (2020). This is so because "[t]he touching of sexual parts for sexual gratification constitutes molestation up until the point of actual penetration; at that point, the act of penetration alone, regardless of motivation, supports a separately punishable conviction for child rape." State v. Land, 172 Wn. App. 593, 600, 295 P.3d 782 (2013).

However, "when there is a possibility that the jury could convict the defendant of both child rape and child molestation based on the same acts of oral/genital contact, the

_____

[7] In the current version of the statute, this definition is codified at RCW 9A.44.010(14)(c).
[8] In the current version of the statute, this definition is codified at RCW 9A.44.010(13).

trial court must instruct the jury that its verdict must be based on separate and distinct acts for each charge." Sanford, 15 Wn. App. 2d at 753 (citing Land, 172 Wn. App. at 603). Nevertheless, the failure to give such an instruction does not "necessarily mean that the defendant received multiple punishments for the same offense; it simply means that the defendant *potentially* received multiple punishments for the same offense." State v. Mutch, 171 Wn.2d 646, 663, 254 P.3d 803 (2011). To determine whether such instructions "actually effected a double jeopardy error," we conduct a rigorous review of the entire trial record, including the evidence presented and the arguments of counsel. Id. at 664; see also State v. Pena Fuentes, 179 Wn.2d 808, 824, 318 P.3d 257 (2014). "If it is not clear that it was '*manifestly apparent* to the jury that the State [was] not seeking to impose multiple punishments for the same offense' and that each count was based on a separate act, there is a double jeopardy violation." Mutch, 171 Wn.2d at 664 (quoting State v. Berg, 147 Wn. App. 923, 931, 198 P.3d 529 (2008)).

Here, as to count 3 for rape in the first degree, the trial court gave a Petrich instruction informing the jury that "one particular act of Rape of a Child in the First Degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved." Then, during its closing, while the State did not elect a specific act, the State explained that "count three is based on an occasion separate and distinct from count[] one and count[] two." The State also informed the jury that it "need[ed] to pick one of the acts . . . that [A.C.D.] testified to and all . . . 12 of you need to agree that that act occurred in order to find him guilty." In discussing the evidence for count 3 in its closing argument, the State reiterated A.C.D.'s testimony that Hernandez-Escobar "stuck his finger inside of her," and recalled her testimony to "all of the rapes

that occurred on her mother's bed, and all of the rapes that occurred while they were standing up in that short hallway with [A.C.D.] pressed against the wall," when Hernandez-Escobar "whispered to her, '[y]ou belong to me. No one else can make you feel the way I . . . make you feel.' " These acts used to prove count 3 all involved penetration and were distinct from the two specific occasions the State relied on to prove counts 1 and 2 for rape of a child.

Because the State relied on multiple acts for count 4, the court gave a <u>Petrich</u> instruction, as it did with count 3. The instruction stated that "to convict the defendant of child molestation in the first degree, one particular act of child molestation in the first degree must be proved beyond a reasonable doubt and you must unanimously agree as to which act has been proved." In its closing, the State likewise explained the requirement of juror unanimity: it alleged that Hernandez-Escobar had committed multiple acts of child molestation in the first degree, the jury was instructed to "unanimously agree as to which act has been proved," and while "the State has only charged the defendant with one count of child molestation and you, members of the jury, need to pick one of these acts and all 12 of you need to agree that that act occurred in order to find the defendant guilty of count four."

A.C.D. testified that Hernandez-Escobar touched "my thighs or my breasts" and would "glide his hands up my legs to reaching the point where my vagina was," underneath her clothing. She also testified that he "rolled up my nightgown, and he had, I guess . . . moved my underwear to the side and he put his fingers over my vagina." In its closing argument, the State emphasized this testimony as evidence of the child molestation count in addition to A.C.D.'s testimony that Hernandez-Escobar "would rub

her legs and squeeze her thighs," would "put his [h]ands on her breasts, squeeze her chest," and "put his hands on her vagina, sliding her underwear over." None of this evidence involved penetration, and, thus, was distinct from the evidence the State relied on to prove count 3, which included Hernandez-Escobar putting his finger inside A.C.D.'s vagina and penetrative acts that occurred on her mother's bed and in the hallway. Moreover, while the State did not elect a specific act, the court instructed the jury on the unanimity requirement.

We conclude that the trial court properly protected jury unanimity by instructing the jury that it needed to unanimously agree that a single (separate) act supported count 3 and count 4. Further, based on our review of the entire trial record, including the evidence presented and the arguments of counsel, see Mutch, 171 Wn.2d at 664, because the State relied on different evidence to establish count 3 (rape of a child) versus count 4 (child molestation), conviction on both counts 3 and 4 did not violate double jeopardy.

C. Jury Poll on Factual Basis for Verdict

Before the start of trial, Hernandez-Escobar sought from the State a bill of particulars explaining which acts the State would rely on for each charge, but the State responded that it was unnecessary. At the close of evidence, the State informed the court that it would elect acts for counts 1 and 2, but not as to counts 3 and 4. Hernandez-Escobar asked the court to include specific date ranges with the jury instructions to support the State's elections, which the court declined to do. The court

acknowledged that the State elected as to counts one and two and confirmed that it would give a Petrich instruction as to counts three and four.

After the court read the jury's verdicts, Hernandez-Escobar confirmed that he wanted the jury polled, specifically, "polled as to the Petrich," which he explained was "to determine what conduct each juror indicates constituted the offense." The court initiated a general poll, and all jurors confirmed that the verdict was theirs. Subsequently, outside the presence of the jurors, in discussing his request for an additional Petrich-based poll, Hernandez-Escobar acknowledged that he did not have legal authority to support the request but "that in order to assure that there was unanimity as to verdict[,] inquiring as to which conduct constituted the offense on the Petrich" made sense. The court declined to conduct an additional poll, reasoning that absent "any particular facts that there was a defect in [the jury's] deliberations or some reason to think that they didn't follow the court's instructions," it would be improper to poll them about what evidence they found satisfied the charges.

Hernandez-Escobar asserts that the trial court's refusal to poll the jury to ascertain the factual basis of its convictions violated his due process rights. In particular, he contends that his right to appeal is inhibited because a reviewing court cannot "meaningfully review the factual basis of the conviction and the sufficiency of the State's evidence unless the jury specifies the basis of its conviction." We disagree.

In general, "neither parties nor judge may inquire into the internal processes through which the jury reaches its verdict." State v. Linton, 156 Wn.2d 777, 787, 132 P.3d 127 (2006). As such, a trial court's "inquiry into the verdict is limited to polling members of the jury to ensure that the verdict read is the actual verdict of each

19

individual. Id. at 788. We presume juries follow instructions unless presented with contrary evidence. State v. Lamar, 180 Wn.2d 576, 586, 327 P.3d 46 (2014). A jury poll is evidence of jury unanimity, unless there is "reason to seriously doubt that the right [to unanimity] has been safeguarded." Id. at 587-88.

Here, the record indicates that the court instructed the jury on juror unanimity. Hernandez-Escobar fails to provide a basis in the record or legal authority to support his argument for a Petrich-based poll. Accordingly, he fails to establish that the trial court erred in declining his request for such a poll.

III. Community Custody Conditions

Hernandez-Escobar challenges as unconstitutional the community custody conditions imposed by the trial court setting geographic boundaries and requiring him to consent to home searches. On appeal, community custody conditions are reviewed for an abuse of discretion and will be struck when manifestly unreasonable. State v. Nguyen, 191 Wn.2d 671, 678, 425 P.3d 847 (2018). A manifestly unreasonable condition is unconstitutional. State v. Bahl, 164 Wn.2d 739, 753, 193 P.3d 678 (2008).

Additionally, a trial court is also permitted to impose "any crime-related prohibitions." RCW 9.94A.703(3)(f). A crime-related condition must be reasonably related to the crime of conviction. Nguyen, 191 Wn.2d at 684. Specifically, a crime-related prohibition is one that directly relates to the circumstances of the crime for which the offender has been convicted. RCW 9.94A.030(10). There need only be "some basis" of nexus between the crime and the condition. State v. Irwin, 191 Wn. App. 644, 657, 364 P.3d 830 (2015); see also Nguyen, 191 Wn.2d at 684 (explaining there must be a reasonable relationship between the crime of conviction and the condition).

A. Standard Condition 8 – Geographic Boundaries

Standard condition 8 mandates Hernandez-Escobar "[r]emain within geographic boundaries, as set forth in writing by the Department of Correction Officer [sic] or as set forth with SODA order." He contends that this condition is vague because it fails to inform him of prohibited conduct and could be arbitrarily enforced.[9] We disagree.

This court recently concluded in State v. Lundstrom that a geographic boundary condition identical to condition 8 in this case was not unconstitutionally vague. 34 Wn. App. 2d 977, 572 P.3d 1243 (2025). We explained that a court ordering such condition "imposed no geographical limitation," but rather complied with the legislature's mandate authorizing community custody officers (CCOs) to impose conditions, including "an order to '[r]emain within prescribed geographical boundaries,' " as authorized by RCW 9.94A.704(3)(b). Lundstrom, 34 Wn. App. 2d at 7. Following the reasoning set out in Lundstrom, we hold that community custody condition 8 is not unconstitutionally vague.

B. Special Condition 8 – Home Searches

Special condition 8 requires Hernandez-Escobar to "[c]onsent to DOC home visits to monitor compliance with supervision. Home visits include access for purposes of visual inspection of all areas of the residence in which the offender lives or has exclusive/joint control/access." Hernandez-Escobar contends that special condition 8 violates article I, section 7 of the Washington Constitution because it authorizes suspicionless searches and does not require a nexus between the search and the

---

[9] Hernandez-Escobar initially contends that the condition is overbroad, but then argues it is vague and cites to authority on vagueness. Because he does not provide argument or authority regarding a separate overbreadth argument, we decline to address that argument.

suspected violation. Therefore, it should be stricken. He further contends that his challenge to special condition 8 is ripe for review.

All persons have a protected right to privacy under the Washington Constitution. Wash. Const. art. 1, § 7. However, a person under community supervision[10] has a reduced expectation of privacy and can be searched by a CCO when they have reasonable suspicion of a probation violation. State v. Winterstein, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009). Further, a supervisee may be subjected to warrantless searches of their property "where there is a nexus between the property searched and the alleged probation violation." State v. Cornwell, 190 Wn.2d 296, 306, 412 P.3d 1265 (2018).

On appeal, a defendant can challenge a community custody condition when it is ripe, meaning "if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." Bahl, 164 Wn.2d at 751. A reviewing court must also evaluate any hardship the parties may endure if the court declines to consider the claim due to ripeness. State v. Valencia, 169 Wn.2d 782, 786, 239 P.3d 1059 (2010).

The State argues that Hernandez-Escobar's challenge to special condition 8 is not yet ripe for review because it has not been enforced, citing State v. Cates, 183 Wn.2d 531, 535, 354 P.3d 832 (2015).[11] Recently, in State v. Nelson, the Washington Supreme Court reaffirmed Cates and concluded that a pre-enforcement challenge to a home visit condition, such as that here, is not ripe for review until the State "attempt[s]

---

[10] The language "under community custody supervision" and "probationer" are written interchangeably.

[11] In Cates, the court imposed a home visit and search condition similar to the condition Hernandez-Escobar challenges here. 183 Wn.2d at 533. There, the court acknowledged that an article I, section 7 violation was possible, but explained that additional factual development was necessary, because a claim would depend on the State's attempt to implement the condition after release. Id. at 533-35 (quoting State v. Valencia, 169 Wn.2d 782, 789, 239 P.3d 1059 (2010)).

to enforce the condition before facts would be sufficiently developed to address the defendant's challenge on its merits and determine whether the circumstances of enforcement are unreasonable." 4 Wn.3d 482, 494-95, 565 P.3d 906 (2025).

Here, as in Cates and Nelson, additional factual development is required, meaning the State must attempt to enforce the home inspection. Following our Supreme Court's direction in Cates and Nelson, we conclude Hernandez-Escobar's challenge to special condition 8 is not ripe for review. Hernandez-Escobar does not face a significant risk of hardship by our declining to review the merits in the absence of additional factual development.

CONCLUSION

Affirmed.

_____
Chung, J.

WE CONCUR:[12]

_____          _____

---

[12] Judge Lee is serving in Division One of this court pursuant to RCW 2.06.040.